[No. C023691. Third Dist. July 28, 1997.]

HUGH P. CAMPBELL, Plaintiff and Appellant, v.
STATE PERSONNEL BOARD et al., Defendants and Respondents;
DEPARTMENT OF GENERAL SERVICES, Real Party in Interest and
Respondent.

**COUNSEL**

Dennis F. Moss for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Martin Milas, Assistant Attorney General, Silvia M. Diaz, Henry G. Ullerich and Jerald L. Mosley, Deputy Attorneys General, for Defendants and Respondents.

K. William Curtis, Kenneth R. Hulse and Roy J. Chastain for Real Party in Interest and Respondent.

OPINION

PUGLIA, P. J.—Plaintiff appeals from a judgment of the superior court denying his petition for writ of administrative mandamus. Plaintiff sought to overturn a decision of defendant State Personnel Board (Board) upholding the termination of his "career executive assignment" with the Office of the State Architect because of a letter he sent to the State Building Standards Commission critical of its actions. Plaintiff contends his reassignment violated constitutional free speech and due process protections. We shall affirm.

I

Plaintiff is a structural engineer who joined state civil service in 1974 in the Office of the State Architect (OSA). OSA, an arm of real party in interest Department of General Services (Department), is charged with responsibility for the erection of public buildings in the state. (Gov. Code, §§ 14950, 14951.) In 1987, plaintiff assumed the position of chief structural engineer, a position he held until the personnel action giving rise to this lawsuit. During plaintiff's tenure, the chief structural engineer reported directly to the state architect and was responsible for the enforcement of state laws relating to safety of design and construction of public schools, hospitals, and other essential service buildings. It was a "career executive assignment," a special category of state civil service reserved for high-level administrative and policy influencing positions (Gov. Code, § 18547).

The position of chief structural engineer was eliminated in late 1992 at least in part due to a conflict which arose between plaintiff and the State Building Standards Commission (BSC). BSC, which is made up of the Secretary of the State and Consumer Services Agency and 10 other members appointed by the Governor (Health & Saf. Code, §§ 18920, 18922), is responsible for, among other things, reviewing building standards adopted by state agencies and codifying appropriate standards into the California Building Standards Code. (Health & Saf. Code, § 18931.)

At a regularly scheduled meeting of BSC on June 18, 1992, one of the items on the agenda was a proposal by OSA to increase the fees charged for its services. Representing OSA at this meeting was Dennis Bellet, one of plaintiff's subordinates. During the discussion of this item, a relatively new member of BSC, Commissioner Storcheim, voiced his objection that the fees already charged by OSA are higher than those proposed in the Uniform Building Code or charged for comparable services by local agencies. Storcheim asked when OSA last conducted "a management or efficiency study" of its operations to determine if the fees charged are necessary.

Storcheim suggested OSA may be "top heavy" and its personnel may not be efficient. Bellet responded he did not know when an efficiency study had last been done but defended the fees as reasonable. After questions from other commissioners, Bellet explained it was difficult for him to respond because he is not "the budget person." Commissioner Storcheim eventually moved to deny OSA's request, but his motion was defeated. BSC tabled the matter until the next meeting.

On July 8, plaintiff sent a letter to Richard Conrad, the Executive Director of BSC, complaining of the conduct of the commissioners at the June 18 meeting. Plaintiff indicated he had "a problem with the questions and statements of Commissioner Storcheim and the influence they had on the subsequent vote to table the proposed fee increase . . . ." Plaintiff complained "it is highly doubtful" Storcheim's questions regarding the fiscal policies of OSA and studies of operational efficiency were "appropriate or necessary to the discussions." Plaintiff suggested Storcheim "should have requested OSA to be prepared to respond to his questions and should have provided a copy of the questions to OSA prior to the meeting."

Plaintiff further remonstrated: "It is unfortunate that Mr. Storcheim chose the forum of the [BSC] June meeting to voice his concerns. The answers were as close as his telephone or FAX and would have been given to all commissioners." Regarding comparable cost of services by OSA and local agencies, plaintiff complained: "Mr. Storcheim reiterated many of the policy statements of the California Building Officials (CALBO) with regard to their desire to return public school plan review to local building department jurisdiction. These policy statements were not relevant to the issue of an OSA fee increase and should not have been permitted by the Chairman."[1] Plaintiff continued: "As a new Commissioner, Mr. Storcheim should have been made aware that when he was appointed to [BSC], he had the responsibility to represent the public in a fair and impartial manner. He should not use [BSC] as a means to further CALBO interests and policies and should not use the meetings as a forum to promote CALBO issues. The Chairman of [BSC] has a responsibility to direct the questions and discussions toward the proposals before [BSC] and not allow such misuse of position by one of the members."

After specifically defending the proposed fee increase, plaintiff resumed his lecture: "I assume that the commissioners receive their meeting agenda

[1]California Building Officials (CALBO) is an organization of local building officials of which John Canestro, the vice-chairman of BSC and the acting chairman of the June 18 meeting, was a member. CALBO had previously passed a resolution that the work OSA structural engineers do in connection with school construction should instead be done at the local level.

information well in advance of the proposed meeting date. If any commissioner has substantive questions concerning the proposed regulation changes, it is suggested that the individual commissioners or [BSC] staff contact the affected agency prior to the meeting so that more complete responses can be available. It is obvious that Mr. Storcheim knew what comments he was going to make, what questions he was going to ask and to what purpose his questions were intended to promote before he came to the June 8, 1992 meeting of [BSC]. A fair and open-minded commissioner would have researched both sides of the issues or at least given OSA time to assemble the required data."

Plaintiff concluded: "I hope my comments will be received in the manner in which they have been written which is, to clarify the role of the state agencies adopting regulations through [BSC]. These comments are further intended to reinforce the fair and reasonable approach by each commissioner to his/her duties and to eliminate so far as possible the promotion of the policies of the special interest groups from which they are chosen. . . ."

Copies of plaintiff's letter were sent to the BSC commissioners. Vice-chairman Canestro considered the letter "inappropriate" and took exception to many of the statements therein. Richard Conrad, the Director of BSC, received telephone calls from several commissioners, including Canestro, who were upset with the "tone" of the letter. On July 24, Canestro sent plaintiff a response which defended the actions of Commissioner Storcheim and suggested plaintiff's letter "indicates a lack of knowledge of the responsibilities of [BSC] or perhaps disdain for the [BSC] proceedings."

Harry Hallenbeck was the state architect during this period. However, he was on medical leave and, in his place, Anthony Pescetti was acting chief of staff. During the period following the mailing of plaintiff's letter, Pescetti received several telephone calls from Ward Connerly, a business owner and the Executive Director of CALBO. Connerly informed Pescetti he had received a copy of the letter from Storcheim and asked whether Pescetti had seen it. Storcheim was a party to the last conversation between Connerly and Pescetti and indicated he thought the letter was inappropriate and harsh. Pescetti apologized on behalf of OSA and indicated he would suggest that plaintiff send an apology as well.

Pescetti discussed the letter with plaintiff and asked him to prepare an apology. Plaintiff drafted an apology letter, but Pescetti was not "comfortable" with it. Pescetti prepared an alternate draft. Plaintiff modified it somewhat, but his modifications were not acceptable to Pescetti. No apology letter was ever sent.

Pescetti gave a copy of plaintiff's July 8 letter to John Lockwood, the Director of the Department. Pescetti informed Lockwood of the calls from Connerly and Storcheim and that BSC commissioners were not happy with the text or tone of the letter. Lockwood also received a call from Connerly regarding the matter. Connerly and Lockwood had known each other for over 20 years and were on a first-name basis. Connerly expressed his opinion plaintiff's letter was inappropriate.

Two or three weeks later, Lockwood decided to relieve plaintiff of his position as chief structural engineer. This decision was due at least in part to the July 8 letter.[2] Lockwood called Pescetti to discuss the matter. He also visited Hallenbeck to inform him of the decision and to ascertain whether Hallenbeck had any strong objections. Plaintiff was thereafter informed by Pescetti of the decision and received written notice from Lockwood.

After plaintiff was relieved as chief structural engineer, the duties of the position were split between the technical and the business functions previously performed by plaintiff. Plaintiff was offered a new position embracing the technical aspects of his former job. In the interim, he resumed the position he had held before becoming chief structural engineer, with a reduction in pay. At the time of the hearing, plaintiff had not yet decided whether to accept the new position offered by OSA.

Plaintiff appealed to the Board the elimination of his career executive assignment. The Board concluded plaintiff's July 8 letter was not protected speech because, while the letter addressed a matter of public concern, the state's interest in a good working relationship between OSA and BSC outweighed plaintiff's free speech interests.

Plaintiff petitioned the superior court for a writ of administrative mandamus. The superior court entered judgment denying relief, concluding, among other things, the Board correctly decided the letter was not protected speech.

## II

█ Plaintiff contends the termination of his career executive assignment because of the July 8 letter to BSC violated his constitutional right of free speech. Plaintiff argues the letter discussed matters of public concern—the proper functioning of BSC and possible conflicts of interest. The Board

---

[2]At the Board hearing on plaintiff's appeal, John Lockwood testified plaintiff's letter was not the only reason for the decision. Evidence was presented that OSA was undergoing a reorganization at the time, in which the position of chief structural engineer was eliminated. However, Lockwood was not asked what other reasons motivated the decision.

counters the letter was not protected speech because the state's interest in the cooperative functioning of OSA and BSC outweighed plaintiff's free speech concerns.

Discipline imposed on a public employee may not infringe constitutionally protected speech. (*Rankin* v. *McPherson* (1987) 483 U.S. 378, 383 [107 S.Ct. 2891, 2896, 97 L.Ed.2d 315, 324].) This does not mean public employees have an unlimited right to express themselves in the workplace as they see fit. The determination whether discipline of a public employee for speech related activities violates constitutional protection requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." (*Pickering* v. *Board of Education* (1968) 391 U.S. 563, 568 [88 S.Ct. 1731, 1734-1735, 20 L.Ed.2d 811].) The proper balance to be struck is a question of law for the court. (*Connick* v. *Myers* (1983) 461 U.S. 138, 148, fn. 7 [103 S.Ct. 1684, 1690, 75 L.Ed.2d 708, 720].)

Assuming arguendo the elimination of plaintiff's career executive assignment may be fairly considered discipline and the July 8 letter addressed a matter of public concern, we agree with the Board the state's interest in harmonious operation of its agencies outweighs plaintiff's free speech interests. As to plaintiff's interests, the July 8 letter was official correspondence from plaintiff as a representative of OSA rather than a personal letter from plaintiff as a private citizen. The letter was printed on OSA letterhead and was signed by plaintiff as chief structural engineer. The text of the letter involved matters germane to the operations of OSA and within the scope of plaintiff's employment. In the letter, plaintiff invited the commissioners to discuss the matter further by calling him at his work number. The letter was not public discourse, as in *Pickering* v. *Board of Education, supra,* 391 U.S. 563, but internal correspondence from one public entity to another. Plaintiff was not expressing his political views to the public or alerting the public to possible wrongdoing. He was doing what he considered part of his job.[3]

As to the state's interest, plaintiff contends the Department failed to demonstrate actual disruption of the working relationship between OSA and BSC. Actual disruption is *not* the standard. The Department was *not* required to wait for an actual deterioration of the working relationship before taking action. It is sufficient if the speech in question was likely to have a disruptive effect. (See *Waters* v. *Churchill* (1994) 511 U.S. 661, 673-676

---

[3]Plaintiff did not testify at the hearing. However, it was stipulated he would testify if called that "he deals with agencies, through correspondence, without having the correspondence reviewed by the State Architect or Mr. Pescetti."

[114 S.Ct. 1878, 1887-1888, 128 L.Ed.2d 686] (plur. opn).) As the court explained in *Connick* v. *Myers, supra,* 461 U.S. at pages 151-152 [103 S.Ct. at page 1692, 75 L.Ed.2d at page 723]: "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." (Fn. omitted.)

In any event, there was ample evidence of a disruption in the relationship between OSA and BSC. Lockwood testified that when he became Director of the Department, the general consensus was that of the 24 officers under his control, OSA was the most criticized and needed the most attention. Harry Hallenbeck, the state architect, testified that when he was appointed to the position in 1991, one of the two concerns expressed to him was the performance of plan checking in the structural safety section. There had been complaints received from users of this service.

As previously explained, when plaintiff sent his letter to BSC, he was acting in an official capacity. Several commissioners expressed their objections to the content and tone of the letter. Richard Conrad, the Director of BSC, wrote a letter to the state architect critical of plaintiff's letter. In it, Conrad stated: "The position stated by Mr. Campbell shows that he lacks knowledge of the responsibilities of our Commission, its members, and staff. It further indicates an attitude of disrespect and disdain for the Commission's responsibilities. . . . [T]he commissioners were surprised and upset with the vehement and accusatory nature of Mr. Campbell's letter. His accusations are unfounded and inaccurate." Complaints regarding the letter also reached Pescetti, the acting head of OSA, and Director Lockwood.

There was a reasonable basis for the Department to conclude that friction between plaintiff and one or more BSC commissioners would disrupt the working relationship between OSA and BSC. Plaintiff occupied a high, policymaking position within OSA. He reported directly to the state architect, an appointed position, and managed a section responsible for the structural safety of public schools. In this position, plaintiff worked directly with BSC.

BSC is responsible for reviewing all building standards adopted by state agencies, including OSA. The matter which led to this dispute was in fact a request by OSA for BSC's approval of a fee increase. In 1991, the Legislature transferred to BSC all responsibility of OSA for adopting building standards within OSA's jurisdiction. (Health & Saf. Code, § 18949.1.) OSA

is required by statute to work with BSC in developing numerous special standards, such as those relating to seismic retrofit (Gov. Code, § 8894), lighting on college campuses (Gov. Code, § 14617), historic buildings (Health & Saf. Code, § 18959), public restrooms (Health & Saf. Code, § 118505), and handicap access (Veh. Code, § 22511.11).[4]

Director Lockwood decided to relieve plaintiff of his position as chief structural engineer two to three weeks after hearing about the letter and the negative reaction of several BSC commissioners and an influential business-man.[5] Lockwood testified: "I felt that the relationship between [BSC] and the . . . Department was harmed by this and I thought we should do something to correct that because we have to work with those people." Lockwood indicated he made his decision based on "what was best for the [D]epartment and [its] relationship with [its] clients." Based on the record before us, the state's interests outweigh any free speech concerns of plaintiff.

## III

Plaintiff contends the elimination of his career executive assignment violated his constitutional right to petition the government for the redress of grievances, a right guaranteed by the First and Fourteenth Amendments to the United States Constitution, and article I, section 3 of the California Constitution.

Whatever else may be said about plaintiff's July 8 letter, it was *not* a petition for the redress of grievances. As previously indicated, the letter was official correspondence by plaintiff as the chief structural engineer of OSA. It charged misconduct by BSC commissioners. Although the letter complained of BSC's failure to take action on OSA's request for a fee increase, this was a "grievance" of OSA, not plaintiff. The Constitution does not guarantee state agencies a right to petition other state agencies for the redress of grievances.

## IV

■ Plaintiff contends the termination of his career executive assignment violated Board rules prohibiting termination on the basis of "political opin-ion." Government Code section 19703 prohibits any change in appointment

---

[4]Although some of these statutory requirements arose after the decision to relieve plaintiff of his career executive assignment, and hence could not have motivated that decision, they are nevertheless illustrative of the ongoing working relationship between OSA and BSC.

[5]In its appellate brief, the Department states the director testified he determined the relationship between the Department and BSC had been harmed after being contacted by several members of BSC complaining of the letter. Lockwood did not so testify. Pescetti *testified he contacted Lockwood about the matter and informed him Connerly and Storcheim* "were not happy with the text of the letter and the tone." Lockwood testified he had no conversations with any commissioners regarding the letter.

of a career executive assignment on the basis of political opinion or affiliation. Board rules provide, in relevant part: "Within 30 days after receipt of notice of termination of a career executive assignment, the affected employee may appeal to the [] Board upon the grounds that the termination was effected for reasons of . . . political opinions." (Cal. Code Regs., tit. 2, § 548.136.) According to plaintiff, "[t]he contents of the July 8, 1992 letter was [*sic*] unquestionably political opinion."

The prohibition against termination of a career executive assignment on the basis of political opinion is independent of free speech considerations. In other words, where an employee's assignment is terminated because of the political views expressed in a specific communication and, upon balancing the state's interests against those of the employee, the communication is deemed not to be protected speech, the termination may nevertheless violate Government Code section 19703.

The Board failed expressly to rule on this issue. The Board contends on appeal it implicitly ruled against plaintiff by virtue of the rejection of plaintiff's free speech contentions. Whether or not this is true, we find nothing in the record to support a conclusion plaintiff's career executive assignment was terminated because of any political views expressed in his July 8 letter rather than the means by which he chose to express them.[6] The complaining commissioners expressed their displeasure with the "tone" of the letter, a tone which was clearly derogatory and offensive. Plaintiff presumed to lecture the commissioners, all of whom were political appointees, regarding their duty to the public. Plaintiff also failed to apologize for what his superiors clearly considered to be misconduct. The record irrefutably demonstrates plaintiff's assignment was terminated not because of his political opinions but because of his ill-conceived and politically inept action of expressing his views in a written tirade to BSC.

V

Plaintiff contends he was denied due process in connection with the elimination of his career executive assignment because he was entitled to, but did not receive, a pretermination hearing.

Government Code section 19889.2 renders provisions governing the selection, classification, and tenure of employees in state civil service inapplicable to career executive assignments. Although this limitation does not

---

[6]Plaintiff does not explain the nature of the "political opinion" expressed in his July 8 letter. Perhaps he is referring to the appropriate allocation of responsibility for school plan review or the proper role of BSC commissioners. In his arguments before the Board, plaintiff suggested the latter.

apply to provisions dealing with punitive actions, termination of a career executive assignment is not considered a punitive action. (Gov. Code, § 19889.2.) Termination of a career executive assignment is prohibited only if based on age (Gov. Code, § 19700), vision impairment (Gov. Code, § 19701), "sex, race, religious creed, color, national origin, ancestry, marital status, physical disability, or mental disability" (Gov. Code, § 19702). Also prohibited is retaliation because of opposition to unlawful employment practices or participation in any investigation, proceeding or hearing on a charge of discrimination (Gov. Code, § 19702) or a change in appointment based on political or religious opinion or affiliation (Gov. Code, § 19703).

The only procedural limitations on the termination of a career executive assignment are those found in Board regulations. California Code of Regulations, title 2, section 599.990 requires that, upon termination of a career executive assignment, "[t]he appointing power, in advance of service of written notice of termination of assignment, shall indicate to the employee its intention to terminate the assignment and the employee shall be privileged to discuss the termination with the appointing power." The appointing power is also required to "serve the employee with written notice of termination of the assignment at least 20 days prior to the effective date of termination." (Cal. Code Regs., tit. 2, § 599.990, subd. (b).) "Within 30 days after receipt of notice of termination of a career executive assignment, the affected employee may appeal to the . . . Board upon the grounds that the termination was effected for reasons of age, sex, sexual preference . . . , marital status, race, color, national origin, ancestry, disability . . . , religion, or religious opinions and affiliation, political affiliation, or political opinion. . . ." (Cal. Code Regs., tit. 2, § 548.136.)

Plaintiff does not contend the Department failed to satisfy the foregoing requirements. Anthony Pescetti, plaintiff's acting supervisor, informed plaintiff of the decision to terminate his career executive assignment. They discussed the reasons therefor and Pescetti indicated plaintiff would be receiving written notice. On September 8, Director Lockwood notified plaintiff in writing of the decision to terminate his assignment effective September 30 and spelled out plaintiff's options thereafter. Plaintiff appealed the decision to the Board, which conducted a hearing and upheld the termination.

Plaintiff contends Board rules do not satisfy due process, which mandates a pretermination hearing. ▮ In *Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774] (*Skelly*), the court held state and federal due process require that permanent civil service employees receive procedural protection before termination of employment in order to minimize the risk of error in the initial termination decision. This requires, at a

minimum, "notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing the discipline." (15 Cal.3d at p. 215.) These procedural protections apply as well to demotions. (*Ng* v. *State Personnel Bd.* (1977) 68 Cal.App.3d 600, 606 [137 Cal.Rptr. 387].)[7]

Before *Skelly* applies, however, a property interest must be implicated. Here, the question is not whether plaintiff had a property interest in a state job but whether his property interest extended to the career executive assignment. As the United States Supreme Court explained: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." (*Board of Regents* v. *Roth* (1972) 408 U.S. 564, 577 [92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561].)

A career executive assignment is "an appointment to a high administrative and policy influencing position within the state civil service in which the incumbent's primary responsibility is the managing of a major function or the rendering of management advice to top-level administrative authority." (Gov. Code, § 18547.) A career executive assignment is a category of civil service employment established by the Board in order "to encourage the development and effective use . . . of well-qualified and carefully selected executives." (Gov. Code, § 19889.) Eligibility for a career executive assignment is based on "competitive examination of persons with permanent status

---

[7]The parties do not seriously dispute the elimination of plaintiff's career executive assignment was a demotion. A September 28, 1992, memorandum indicates plaintiff was paid $6,828 per month as chief structural engineer. After termination of that position, plaintiff chose to accept a job as a principal structural engineer with OSA. He was entitled to a special pay rate for 90 days of $6,503 per month. His pay rate thereafter is not indicated but presumably would be something less than the special rate. This reduction in pay distinguishes the present matter from *Shoemaker* v. *County of Los Angeles* (1995) 37 Cal.App.4th 618 [43 Cal.Rptr.2d 774], a case relied upon by the Department. The plaintiff in *Shoemaker* was removed from an administrative position and returned to his prior post. However, there was no change in his compensation, benefits, classification, and grade. (*Id.*, at p. 623.)

in the civil service who meet such minimum qualifications as the . . . Board may determine are requisite to the performance of high administrative and policy influencing functions." (Gov. Code, § 19889.3.)

Of particular relevance to this dispute, Government Code section 18547 provides that appointment to a career executive assignment "does not confer any rights or status in the position other than provided in Article 9 (commencing with Section 19889) of Chapter 2.5 of Part 2.6." Government Code section 19889.3 reads: "No person employed in a career executive assignment shall be deemed to acquire as a result of such service any rights to or status in positions governed by the provisions of this part relating to the civil service other than the category of career executive assignment, except as provided by . . . Board rule."

As previously noted, Government Code section 19889.2 renders inapplicable to career executive assignments those provisions of the state civil service governing selection, classification, and tenure, except for provisions dealing with punitive actions. However, termination of a career executive assignment is not considered a punitive action. (Gov. Code, § 19889.2.) Upon termination of a career executive assignment, Board rules provide a right of appeal to the Board within 30 days "upon the grounds that the termination was effected for reasons of age, sex, sexual preference . . . , marital status, race, color, national origin, ancestry, disability . . . , religion, or religious opinions and affiliation, political affiliation, or political opinion." (Cal. Code Regs., tit. 2, § 548.136.) No other basis is provided for setting aside a decision to terminate a career executive assignment.

■ The foregoing provisions fail to establish a property right in a career executive assignment. The provisions of state civil service law relating to selection, classification, tenure, and punishment are inapplicable. There is no requirement that termination be based on "cause," a factor critical to the *Skelly* decision. (*Skelly, supra,* 15 Cal.3d at pp. 207-208.) A career executive assignment may be terminated for any reason or no reason, provided such termination does not offend other laws applicable to state employees and nonemployees alike. No property interest is created by provisions according protection against, for example, racial discrimination inasmuch as such right is enjoyed by the public at large. Because no protectable property interest exists, plaintiff was not entitled to any greater process than provided by the statutes and Board rules.

Plaintiff contends the Board cannot limit his property rights by virtue of the very provisions which define the process to which he is due. ■ In *Cleveland Bd. of Education* v. *Loudermill* (1988) 470 U.S. 532, 541 [105

S.Ct. 1487, 1493, 84 L.Ed.2d 494, 503], the high court explained: "[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. 'Property' cannot be defined by the procedures provided for its deprivation any more than life or liberty." (Accord, *Coleman* v. *Department of Personnel Admin.* (1991) 52 Cal.3d 1102, 1114 [278 Cal.Rptr. 346, 805 P.2d 300].)

*Cleveland Bd. of Education* v. *Loudermill, supra,* 470 U.S. 532, is inapposite. The statutory scheme governing career executive assignments does not define property rights by virtue of the procedures used for their termination. The *substantive* property rights are defined by virtue of the provisions rendering inapplicable to career executive assignments the normal civil service safeguards (Gov. Code, § 19889.2) and indicating a career executive assignment does not confer any rights or status other than as provided elsewhere. (Gov. Code, §§ 18547, 19889.3.) The *procedures* to which a career executive is entitled upon termination are verbal notice and a chance to respond, 20 days' written notice, and a right to appeal to the Board. These procedures do not define property rights.

The judgment is affirmed.

Blease, J., and Davis, J., concurred.