[No. C028402. Third Dist. July 11, 2001.]

PROFESSIONAL ENGINEERS IN CALIFORNIA GOVERNMENT et al., Plaintiffs and Appellants, v.
STATE PERSONNEL BOARD et al., Defendants and Respondents.

## COUNSEL

Dennis F. Moss and Steven Bassoff for Plaintiffs and Appellants.

Daniel E. Lungren and Bill Lockyer, Attorneys General, Martin H. Milas, Assistant Attorney General, Marybelle D. Archibald and Vincent J. Scally, Jr., Deputy Attorneys General, for Defendant and Respondent State Personnel Board.

K. William Curtis, Kenneth R. Hulse, Marguerite D. Shea and Linda Diane Buzzini for Defendant and Respondent Department of Personnel Administration.

## OPINION

**MORRISON, J.**—In this case we decide that the Career Executive Assignment (CEA) program does not violate the civil service mandate of the California Constitution. However, the implementing regulations that allow selection and transfer of applicants without ranking them violate statutes implementing the constitutional requirement of a "system based on merit ascertained by competitive examination." As we recently held in *Alexander v. State Personnel Bd.* (2000) 80 Cal.App.4th 526, 542 [95 Cal.Rptr.2d 324] (*Alexander*), competition denotes a rivalry: "It encompasses a comparison of relative merit." Such comparison requires rankings.

With specified exceptions, a civil service system governs state workers, as provided by the California Constitution. (Cal. Const., art. VII, § 1, subd. (a); see *Professional Engineers v. Department of Transportation* (1997) 15 Cal.4th 543, 548 [63 Cal.Rptr.2d 467, 936 P.2d 473].) "In the civil service permanent appointment and promotion shall be made under a general system based on merit ascertained by competitive examination." (Cal. Const., art. VII, § 1, subd. (b).) The Legislature created the CEA program to promote governmental efficiency. A person may leave a regular civil service position to accept a CEA appointment. When the appointment terminates, the person returns to the former post.

Professional Engineers in California Government and other groups of state workers (collectively the Engineers) filed a petition seeking declaratory and other relief, alleging the CEA program violates the civil service provisions of the California Constitution. The State Personnel Board (the Board) and the Department of Personnel Administration (the Department) appeared separately to oppose the claims. The trial court denied the petition and the Engineers timely appealed.

We held this case pending resolution of a case raising similar issues. (*Alexander, supra,* 80 Cal.App.4th 526.) Although we reject some of the

Engineers' claims, they correctly contend the present system improperly allows some CEA appointments without competitive examination. We shall modify the judgment and affirm.

DISCUSSION

I. *Background.*

From statehood, patronage filled most state jobs. Reportedly, Governor Hiram Johnson "followed two guidelines in filling government slots prior to the implementation of the civil service system. First, the State should receive the most efficient service attainable. Second, those most able to furnish this service should be picked from the better party—Republican." (King, Deliver Us from Evil: A Public History of California's Civil Service System (1979) p. 9 (hereafter King).) California adopted its first civil service system by statute during the Progressive Era in 1913. (Stats. 1913, ch. 590, p. 1035.) This plan would not only ensure good state workers, but, in tail-wags-dog fashion, ensure good politics. "When the next fight for Governor comes off, there will be no spoils of office to promise or barter away. The election will go off entirely on the character of the two men who are appealing to the people for their suffrage and on the principles of government which they advocate." (King, *supra*, at p. 9.)

In 1934 the People, in the exercise of their reserved initiative powers—powers wrested from the central government during the same Progressive Era—adopted a number of provisions designed to strengthen the existing civil service system. The California Supreme Court reviewed the history as follows:

"In 1913, the California Legislature enacted a statute creating California's first civil service system in an attempt to combat the 'spoils system' of political patronage in state employment. (Stats. 1913, ch. 590, p. 1035.) By the early 1930's, however, the existing statutory civil service system was obviously failing in its primary task. The deficiencies in the system stemmed from several principal sources. First, acceding to political pressure, both the Legislature and the statutory civil service commission itself had over the years exempted numerous departments and positions from the civil service restrictions: indeed, by 1932 the exemptions had become so widespread that '[o]f the 23,222 full-time state employees, only 11,917 held permanent civil service positions.' [(Citing King, *supra*, at p. 26.)] Thus, fully one-half of the permanent state employees were exempt from the civil service law.

" 'A second abuse of the Civil Service Act was the gross misuse of authorizations for temporary employment [which was not subject to the civil

service act] . . . . Officially, temporary appointments followed the three month rule, but this had never been followed. By August 1931, temporary employees constituted more than a third of the entire state service.' [(*King, supra*, at p. 26.)]

"Finally, in the early 1930's considerable public attention was focused on the problem by widespread newspaper accounts of the allegedly numerous politically motivated appointments made by the incumbent Governor. (*Id.* at pp. 26-29.)

"It was in this milieu and in response to the specific problems of the times that in 1934 the people adopted article XXIV of the state Constitution. The ballot argument accompanying the 1934 initiative measure sets forth in clear terms both the objectives and the limits of the proposed constitutional provision.

"The ballot argument stated: 'The purpose of this constitutional amendment is to promote efficiency and economy in State government. *The sole aim of the act is to prohibit appointments and promotion in State service except on the basis of merit, efficiency and fitness ascertained by competitive examination.* Appointments of inefficient employees for political reasons are thereby prohibited, thus eliminating the "spoils system" from State employment. [¶] . . . [T]his constitutional amendment provides: (1) Employment in the classified service based solely on merit and efficiency; (2) a nonpartisan Personnel Board; (3) prohibition against exemptions from the merit system of employment; (4) correction of the temporary political appointment evil. [¶] *Having by constitutional mandate prohibited employment on any basis except merit and efficiency, thereby eliminating as far as possible the "spoils system" of employment, the Legislature is given a free hand in setting up laws relating to personnel administration for the best interests of the State,* including the setting up of causes for dismissal such as inefficiency, misconduct or lack of funds.' (Italics added.) [Citing Ballot Pamp.]" (*Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 181-183 [172 Cal.Rptr. 487, 624 P.2d 1215], fn. [containing complete ballot argument] omitted (*PLF*); see *Pinion v. State Personnel Board* (1938) 29 Cal.App.2d 314, 318 [84 P.2d 185] (*Pinion*) [now "permanent appointments and promotions in the state civil service shall be made exclusively under the general system based upon merit, efficiency and fitness as ascertained by competent examinations"].)

The Constitution exempts specified positions from the civil service. Broadly speaking, these are elected or confidential employees, such as judicial, gubernatorial and legislative employees, elected officials, a specified number of deputies of elected officers, and board and commission

members or deputies; university officials and employees are also exempted. (See, e.g., Cal. Const., arts. VII, § 4 [listing major exemptions], IX, § 2.1, XX, § 22.)

The People moved the language at issue in this case to its present location in 1976. (*PLF, supra,* 29 Cal.3d at p. 184, fn. 8.) The Engineers concede no material change in the constitutional language has taken place since 1934.

California Constitution, article VII, section 1 provides: "(a) The civil service includes every officer and employee of the State except as otherwise provided in this Constitution. [¶] (b) In the civil service permanent appointment and promotion shall be made under a general system based on merit ascertained by competitive examination." Article VII, section 5 provides: "A temporary appointment may be made to a position for which there is no employment list. No person may serve in one or more positions under temporary appointment longer than 9 months in 12 consecutive months."

In 1963, the Legislature, drawing on ideas originally proposed by President Eisenhower's Hoover Commission, created "a new kind of civil service appointment" as part of a program "to give scope to younger civil service employees possessing extraordinary ability and initiative, and to enhance the ability of the policy-forming heads of state agencies to perform efficiently the tasks for which the public holds them accountable. [¶] When a vacancy occurs in a civil service position 'of a high administrative and policy influencing character' [citation] the State Personnel Board may designate the position as a career executive assignment. The statutes normally 'governing the selection, classification, salary, tenure and other conditions of employment' in the civil service do not apply to career executive assignments unless so provided by board rule. [Citation.] Eligibility for a career executive appointment is established by competitive examination which may be opened to a much larger field of candidates (limited to permanent civil service employees) than could compete in a conventional promotional examination." (*Cryor v. State Personnel Bd.* (1967) 253 Cal.App.2d 100, 102 [61 Cal.Rptr. 243] (*Cryor*); see Van Riper, History of the United States Civil Service (1976) pp. 495-496, 517-518 (Van Riper) [origin of federal policy-making employees].)

The history cited in *PLF, supra,* 29 Cal.3d 168, explains that Governor Pat Brown had "difficulty in getting his programs rolling because of the opposition of top-level bureaucrats who were unsympathetic or indifferent to the Administration's policies." (King, *supra,* at p. 49; see also Musolf, *California's Career Executive Assignment: II. A Perilous But Necessary Voyage*

(1964) 25 Pub.Pers.Rev. 87 (Musolf) ["the Board has correctly identified shoals in the area, shoals in the form of strong criticisms from political heads of agencies about a lack of sensitivity to program in their top administrative assistants"].) The Department agrees that "successful examination competitors were frozen into high level executive positions with responsibility for influencing policy."

But how does one provide flexibility in hiring without reinstating a spoils system? "Borrowing the idea of tenure at pleasure from Spoils, the Career Executive Assignment Plan adapts it sharply. The important (but unstated) distinction made is one between social bias and partisan bias, between enthusiasm for a governmental program and enthusiasm for a political party." (Musolf, *supra*, at p. 88; see Hackett, Higher Civil Servants in California (1966) pp. 114-115 (Hackett) ["although a 'partisan bias' continues to be an illigitimate [*sic*] basis for terminating an appointment, a 'program bias' is not"].)

Current statutes provide in relevant part as follows:

" 'Career executive' means an employee appointed from . . . a list of persons with permanent status in the civil service who are available for career executive assignments, in which selection, classification, salary, tenure, and other conditions of employment may be varied from those prevailing . . . for other employees in the state civil service." (Gov. Code, § 18546; further section references are to this code.)

" 'Career executive assignment' means an appointment to a high administrative and policy influencing position within the state civil service in which the incumbent's primary responsibility is the managing of a major function or the rendering of management advice to top-level administrative authority. Such a position . . . is typified by broad responsibility for policy implementation and extensive participation in policy evolvement. . . ." (§ 18547.)

"It is the purpose of this article to encourage the development and effective use in the civil service of well-qualified and carefully selected executives. In order to carry out this purpose the State Personnel Board shall establish by rule a system of merit personnel administration specifically suited to the selection and placement of executive personnel. The department shall be responsible for salary administration, position classification, and for the motivation and training of executive personnel. For the purpose of administering this system there is established herewith a category of civil service appointment called 'career executive assignments.' The department

shall designate positions of a high administrative and policy influencing character for inclusion in or removal from this category subject to review by the State Personnel Board, except that the department shall not so designate a position in which there is an incumbent already appointed under the provisions of this part governing employees other than career executives." (§ 19889.)

"The provisions of this part governing the selection, classification, and tenure of employees in the regular civil service shall not apply in administering executive personnel through a merit system utilizing 'career executive assignments' unless the application is provided by State Personnel Board rule. The provisions of this part relating to punitive actions shall apply to employees serving in career executive assignments, except that termination of a career executive assignment as provided for in Section 19889.3 is not a punitive action. With reference to termination of career executive assignments, the State Personnel Board rules shall, as a minimum, afford an employee a right of appeal to the State Personnel Board for restoration of his or her assignment when he or she alleges that his or her termination was for reasons prohibited in Chapter 10 (commencing with Section 19680) of Part 2." (§ 19889.2.)

"Eligibility for appointment to positions in the career executive assignment category shall be established as a result of competitive examination of persons with permanent status in the civil service who meet such minimum qualifications as the State Personnel Board may determine are requisite to the performance of high administrative and policy influencing functions. No person employed in a career executive assignment shall be deemed to acquire as a result of such service any rights to or status in positions governed by the provisions of this part relating to the civil service other than the category of career executive assignment, except as provided by State Personnel Board rule. The State Personnel Board shall provide by rule that an employee shall, if he or she so desires, at the termination of his or her appointment to a career executive assignment, be reinstated to a civil service position that is (a) not a career executive assignment and (b) that is at least at the same salary level as the last position that he or she held as a permanent or probationary employee. . . ." (§ 19889.3.)

## II. *Scope and Standard of Review.*

The Engineers complain the civil service system established by the California Constitution calls for permanent appointment and promotion under a "general system based on merit," but that the CEA system results in

unlawful temporary appointments, appointments not based on merit, and appointments not subject to the "general" civil service system.

■ In reviewing these claims, we observe the California Constitution does not grant power to the California Legislature as the United States Constitution grants power to Congress, it restricts the Legislature. (*Collins v. Riley* (1944) 24 Cal.2d 912, 916 [152 P.2d 169] (*Collins*); see *Allen v. State Board of Equalization* (1941) 43 Cal.App.2d 90, 93 [110 P.2d 73].) The presumption of constitutionality strengthens where the Legislature passes a statute with the relevant constitutional provision in mind and it exists for many years. (See *In re Governorship* (1979) 26 Cal.3d 110, 120 [160 Cal.Rptr. 760, 603 P.2d 1357].) The Engineers make a facial challenge to statutes drafted with the constitutional limitations on the civil service system in mind, accordingly, the legislation, long unchallenged, carries a heavy presumption of constitutionality, and the Engineers "must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." (*PLF, supra,* 29 Cal.3d at pp. 180-181.)

The California State Employees' Association (CSEA), a party herein, *did* challenge the legislation in 1964. CSEA lost a suit raising the same claims raised today, but the decision was not published. Although the trial court mentioned res judicata as an alternate holding as to CSEA and the Association of California State Supervisors, no party discusses the possible preclusive effect of the prior litigation and we will not address the point.

The history of legislation and social conditions informs courts as to the function of positive law. (E.g., *California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].) Throughout their briefs the Engineers refer to a variety of legislative and administrative documents to establish the supposed "intent" of the various statutes and constitutional provisions at issue. We grant the request to judicially notice the existence of these government documents. Most consist of the usual detritus contained in legislative files, which do not purport to reflect the views of the Legislature as a whole, but exist in a packet prepared by a private "legislative intent" company. ■ One finds the intent of the Legislature and of the People in the words of statutes and initiatives, not elsewhere. (*People v. Knowles* (1950) 35 Cal.2d 175, 182 [217 P.2d 1]; see *Fletcher v. Peck* (1810) 10 U.S. (6 Cranch) 87, 130 [3 L.Ed. 162, 176]; *People v. Snook* (1997) 16 Cal.4th 1210, 1215 [69 Cal.Rptr.2d 615, 947 P.2d 808].) When and only when a party raises a linguistic ambiguity, meaning a circumstance in which two *plausible* candidates of construction exist (see

*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 776 [72 Cal.Rptr.2d 624, 952 P.2d 641]), does a court find it necessary to consult extrinsic materials. The fact a document exists in a legislative or gubernatorial file, or within the state archives, does not mean it expresses meaning not present in the statutory language. (See *San Rafael Elementary School Dist. v. State Bd. of Education* (1999) 73 Cal.App.4th 1018, 1030 [87 Cal.Rptr.2d 67] ["The letters show something about the opinion of someone in Finance about the meaning of some of the language"]; *United States v. Estate of Romani* (1998) 523 U.S. 517, 535-537 [118 S.Ct. 1478, 1488-1489, 140 L.Ed.2d 710, 726-727] (conc. opn. of Scalia, J.).)

### III. *The "General System" Mandate.*

The California Constitution provides: "In the civil service permanent appointment and promotion shall be made under a general system based on merit ascertained by competitive examination." (Cal. Const., art. VII, § 1, subd. (b).)

■ The Engineers contend, "The 'special system' established for CEAs is a flagrant deviation from the 'general system' mandate." "A governor's call for a special system for one category within the civil service, legislation permitting such a separate system, and regulations that establish such a system are all unconstitutional." The California Constitution does not explicitly prohibit treating different classes of employees differently. Nor does it implicitly do so, so long as the mechanism does not tend to reinstate a spoils system.

"Neither the statute providing for career executive assignments nor the board's action in putting the program in motion has created any 'positions.' Positions in the state service are established by the appointing power having jurisdiction in the particular agency, as authorized by law and subject to the budget. [Citation.] Civil service laws provide procedures for filling vacant positions and establish the tenure and other rights of the person lawfully appointed. [The CEA statutes] merely provide a different method of selection, and different rights on the part of the person appointed during such time as the position has been designated by the Personnel Board to be a career executive assignment." (*Cryor, supra,* 253 Cal.App.2d at p. 106.)

In *State Trial Attorneys' Assn. v. State of California* (1976) 63 Cal.App.3d 298, 301, footnote 3 [133 Cal.Rptr. 712], we noted: "Career executive assignments involve appointments to positions of high authority in the state government but within the civil service structure. (§§ 18547, 19220-19222.)" (See § 18547 ["within the state civil service"]; 67 Ops.Cal.Atty.Gen. 65, 66

(1984) ["Within the state civil service is the distinct category" of CEA's].) The fact that certain tendered documents purportedly showing the "intent" of the Legislature refer to a "special merit system," does not mean the CEA system exists apart from the "general system based on merit ascertained by competitive examination" mandated by the California Constitution.

"[T]he 'sole aim' of the amendment was to establish, as a constitutional mandate, the principle that appointments and promotions in state service be made solely on the basis of merit. Having established this 'merit principle' as a matter of constitutional law, and having established a nonpartisan Personnel Board to administer this merit principle, the constitutional provision left the Legislature with a 'free hand' to fashion 'laws relating to personnel administration for the best interests of the State.' " (*PLF, supra,* 29 Cal.3d at pp. 183-184, fn. omitted.) And we have said before the provisions did not create "an organic blueprint for the structure of agencies within the state's executive branch." (*California State Employees' Assn. v. Williams* (1970) 7 Cal.App.3d 390, 398 [86 Cal.Rptr. 305], quoted with approval, *PLF, supra,* 29 Cal.3d at pp. 195-196.)

.We agree with former Assistant Attorney General Willard Shank, who pointed out some 35 years ago (opposing CSEA's complaint in the earlier litigation): "The 'merit' principle was and still is dependent upon the preliminary determination that a prospective governmental employee should be qualified through a combination of education, training and experience for employment. The essence of the 'spoils' system' on the other hand turned upon how active a prospective appointee had been in his support of a winning political party or candidate. [¶] The civil service reformers found in the 'competitive examination' the device through which qualifications could be ascertained."

The Constitution grounds the "general system" in "merit ascertained by competitive examination." (Cal. Const., art. VII, § 1, subd. (b).) Indeed, we previously referred to the competitive examination as "the cornerstone of the constitutional merit principle." (*Lund v. California State Employees Assn.* (1990) 222 Cal.App.3d 174, 186 [271 Cal.Rptr. 425].)

In *Kidd v. State of California* (1998) 62 Cal.App.4th 386 [72 Cal.Rptr.2d 758] (*Kidd*), we invalidated a "supplemental certification" program which undermined competitive examinations by devaluing candidates with higher scores because of their ethnicity and gender. (*Id.* at p. 393.) "Both the constitutional provision and the ballot argument in favor thereof are remarkably straightforward: The Legislature . . . . has a free hand with regard to

personnel administration *except* that with regard specifically to appointment to service, merit and efficiency shall be the only considerations. The merit principle is sacrosanct; however free the hand of the Legislature, *neither that hand nor the hand of any other branch or agency of government can manipulate the merit principle to serve ends inconsistent with article VII of the state Constitution.*" (*Id.* at pp. 401-402, fn. omitted, original italics.)

The requirement of a competitive examination undermines the Engineers' view the CEA statutes comprise some "special" system not contemplated by the Constitution. The fact some permanent civil servants are treated differently, because they have demonstrated *by competitive examination* their fitness for policymaking positions, does not mean the CEA statutes thwart the "general" civil service system mandate.

We reached a similar result in *Alexander, supra,* 80 Cal.App.4th at pages 536-537, rejecting a claim that statutes distinguishing certain positions created a "special" system in derogation of the California Constitution. We adhere to that view here and find CEA's are part of the general merit system.

IV. *Temporary Appointments.*

The California Constitution curtails temporary appointments, which were historically used to bypass civil service regulations. (See *PLF, supra,* 29 Cal.3d at pp. 181-183.) The Engineers contend because a CEA appointment has no fixed term, such appointment violates the California Constitution. We agree with the premise, but not the conclusion.

A CEA appointee does not hold a "temporary appointment" within the meaning of the California Constitution. "A temporary appointment may be made to a position for which there is no employment list. No person may serve in one or more positions under temporary appointment longer than 9 months in 12 consecutive months." (Cal. Const., art. VII, § 5.) A person can remain a CEA appointee indefinitely. (E.g., *Campbell v. State Personnel Bd.* (1997) 57 Cal.App.4th 281, 284 [66 Cal.Rptr.2d 722] (*Campbell*) [five years].) Although a CEA employee holds no tenure rights in the CEA position, neither does a CEA appointee occupy a "temporary appointment."

On the other hand, neither does a CEA appointee become a "permanent" holder *of the CEA position.* " 'Permanent employee' means an employee who has permanent status. 'Permanent status' means the status of an employee *who is lawfully retained in his position after the completion of the* probationary period provided in this part and by board rule." (§ 18528.) No set "probationary period" for a CEA exists. Viewed another way, as the

Engineers do, "CEA appointees are essentially on perpetual probation." Generally, state employees become "permanent" civil service employees upon completion of their probationary term. Only "permanent" civil service employees may become CEA appointees, but neither becoming a CEA appointee nor leaving a CEA position alters the "permanency" of a civil servant's status.

Once a position has been classified as a CEA position, the appointing authority holds a competitive examination, after which a candidate may become eligible for appointment. (§ 19889.3.) Such employee enjoys no tenure in his position, i.e., no right to the position absent cause. (See *Cronin v. Civil Service Com.* (1925) 71 Cal.App. 633, 643-646 [236 P. 339] [protection from discharge not a necessary component of a civil service system].) The appointing authority may terminate a career executive without cause, for any reason excepting various forms of invidious treatment—including termination for political affiliation or opinions. (§§ 19700-19703; see *Campbell, supra,* 57 Cal.App.4th at pp. 291-292; Cal. Code Regs., tit. 2, § 548.136 [providing for appeal to the Board in cases of alleged violations].) When a person leaves a CEA position, the person has the right to return to the position whence the person came, unless terminated with cause, in which case the person receives the protections enjoyed by all other permanent civil service employees facing discipline. When a CEA appointee leaves state service, "The career executive assignment of a person so separated shall be deemed to have been terminated, and the separation to have been from a position in the class in the general civil service in which the employee had permanent status." (Cal. Code Regs., tit. 2, § 548.145.) The employee has never left the general civil service system, but retains tenure as a permanent civil service employee. We agree with the Department: "The Constitution does not require that otherwise permanent State employees be retained in particular assignments subject only to removal for cause." The constitutional provisions keep political friends off the state payroll, but do not dictate particular slots for any employee.

A CEA appointee must first qualify as a "permanent" civil service employee. But the fact an employee working in a CEA position has no tenure therein does not mean the statutes transgress any "permanency" requirement. The California Constitution states "permanent appointment and promotion shall be made under a general system based on merit ascertained by competitive examination." (Art. VII, § 1, subd. (b).) As the Attorney General observes on behalf of the Board, "The section provides that all permanent appointments must be based on merit, but does not provide the converse, that all merit-based appointments must be permanent." The Engineers fail to show the CEA statutes conflict with the Constitution in this regard.

A CEA appointee qualifies as a "permanent" state employee, with all the protections and obligations of other state employees. (Cf. *Spaulding v. Philbrick* (1940) 42 Cal.App.2d 58, 61-63 [108 P.2d 59] [service under temporary appointment does not ripen into permanent status]; *Ticknor v. City of Sacramento* (1947) 80 Cal.App.2d 284, 289-290 [181 P.2d 893] [similar holding, under municipal charter].) A department may not "promote" an employee simply by assigning him the duties of a higher position. (See, e.g., *Pinion*, *supra*, 29 Cal.App.2d at pp. 319-320 [lest "our present plan of civil service will fail"]; *Otto v. Reardon* (1937) 21 Cal.App.2d 260 [69 P.2d 185]; 2 Ops.Cal.Atty.Gen. 86 (1943).) But a political friend cannot be given a CEA position at the whim of the administration, as under a spoils system. (See, e.g., *PLF*, *supra*, 29 Cal.3d at p. 182.) An appointing authority must first designate a given (vacant) position as one appropriate for a CEA (§ 19889; see *Cryor*, *supra*, 253 Cal.App.2d at p. 102), then draw an appointee from a group established "as a result of competitive examination of persons with permanent status in the civil service who meet such minimum qualifications as the State Personnel Board may determine are requisite to the performance of high administrative and policy influencing functions." (§ 19889.3.) The appointing power cannot alter occupied positions without examination. (See, e.g., 67 Ops.Cal.Atty.Gen. 65, 68-69 (1984) [statute invalid partly because it "operates upon existing occupied positions, effects promotions without the benefit of examination"].)

We agree persons occupying CEA positions do not neatly fit within the traditional categories of "permanent" and "temporary" employees. But the Engineers have not shown the California Constitution forbids this result. Accordingly, we reject their claim. (*Collins*, *supra*, 24 Cal.2d at p. 916.)

## V. *Competition.*

As explained above, the requirement of competition for CEA positions provides the bulwark against favoritism. The Engineers question whether CEA lists result from competitive examinations and question whether transfer provisions lawfully permit appointees to bypass examination. The Engineers fault the use of subjective criteria, and the lack of ranking of applicants, echoing earlier criticisms: "It is conceivable that political heads of agencies will simply look for partisans, believing that this is the most logical way to identify enthusiasm for a program." (Musolf, *supra*, at p. 88; see Hackett, *supra*, at p. 116 [describing CSEA's earlier lawsuit as claiming whether any "truly viable distinction can be made between 'political' and 'program' commitments' "].) We agree with the Engineers in part.

## A. *Rankings.*

The employment list arises from examinations. Section 19889.3 provides in part "Eligibility for appointment to positions in the career executive assignment category shall be established as a result of *competitive examination . . . .*" (Italics added.) Various regulations govern the examinations, including, critically, the following:

"Examinations for appointment to Career Executive Assignment positions shall be competitive and of such character as fairly to test and determine the qualifications, fitness and ability of competitors actually to perform the duties of the position to be filled. Examinations may be assembled or unassembled, written or oral, or in the form of a demonstration of skill, or any combination of these; and an investigation of character, personality, education and experience and any tests of intelligence, capacity, technical knowledge, manual skills, or physical fitness which the appointing power subject to the approval of the executive officer deems are appropriate, may be employed.

"It is the purpose of this selection system to provide examination options that are particularly suited to fill efficiently each vacant position. Examination results need not be expressed in specific ratings of individuals. The person appointed as a result of a competitive examination must be well qualified and carefully selected. The appointing power is required to promulgate the qualifications that will be used as standards in conducting the examination but is not required to distinguish between groups or individuals as to who is qualified or not qualified or as to relative level of qualification. Examinations may range from (1) a review of applications from which a selection is made, to (2) the use of supplemental applications, appraisal of performance and executive potential, management exercises and/or structured interviews." (Cal. Code Regs., tit. 2, former § 548.40.)

 Although this regulation purports to require the use of "competitive" examinations, it also states the appointing authority "is not required to distinguish between groups or individuals as to who is qualified or not qualified or as to relative level of qualification."

The Engineers contend this regulation does not require rankings among applicants and urge examinations without rankings do not qualify as competitive examinations. We agree. We previously declared the regulation invalid. (*Alexander, supra*, 80 Cal.App.4th at pp. 540-544.) We adhere to our view.

A competitive examination must distinguish the relative merits of candidates. As former Presiding Justice Robert K. Puglia put it, "The notion that

defendants can hire any applicant who passes an examination without consideration of that applicant's standing in relation to others who passed the examination reads the word 'competitive' out of the state Constitution." (*Kidd, supra,* 62 Cal.App.4th at p. 402; see *Almassy v. L. A. County Civil Service Com.* (1949) 34 Cal.2d 387, 398 [210 P.2d 503] (*Almassy*) ["each candidate was pitting his personality traits against those of every other candidate incident to the examiner's process of making comparative evaluations—so that the ratings in consequence of such 'open' contest may properly be said to rest on a competitive basis"]; *State ex rel. King v. Emmons* (1934) 128 Ohio St. 216, 221 [190 N.E. 468, 471] ["the candidates match their qualifications each against the others, and the final determination is made by rating and comparison"], quoted approvingly in *Almassy, supra,* 34 Cal.2d at p. 398.) And as Justice Cardozo put it, "The test is not merely examination. The test is competitive examination. Competition is useless if favor may reverse the verdict. Eligibility counts for little if grades of eligibility may be established without restriction. Sublists may then be made up of one political party or another." (*Barthelmess v. Cukor* (1921) 231 N.Y. 435, 445 [132 N.E. 140, 143, 16 A.L.R. 1404].) We agree with these views.

The Board and the Department seek to distinguish *Kidd, supra,* 62 Cal.App.4th 386, pointing out competitive examinations took place in that case, but the appointing authority perverted the results by invidious discrimination on the basis of sex and race. This does not undermine the general truth of the passages just quoted, that is, the word "competitive" imports notions of *relative* worth. The portion of *Kidd* defining competition expressed a general idea and is, indeed, applicable to this case. Similarly, the Board and the Department point out *Almassy, supra,* 34 Cal.2d 387, focused on the openness of the examination, eschewing a rule which would allow the hirer to choose the candidates for the examination at will, and also upheld the use of subjective criteria within the examination. (*Id.* at p. 398; see *Benz v. Walker* (1966) 154 Conn. 74, 86-87 [221 A.2d 841, 846] (conc. opn. of Murphy, J.) [praising *Almassy,* "which holds . . . the fact that some of the standards are subjective rather than objective does not prevent the oral examination from being classified as competitive"].) But this does not obviate the need for competition *among* examinees. (Accord, *McGowan v. Burstein* (1988) 71 N.Y.2d 729, 732 [525 N.E.2d 710, 530 N.Y.S.2d 64, 65, 525 N.E.2d 710, 711] (*McGowan*) ["overly broad zones could negate the competitiveness of the test, allow too much room for the subjective judgments of appointing authorities and invite personal and political influence into the selection process. Any practice with such potential must be approached with skepticism"].)

The Attorney General, on behalf of the Board, concedes CEA appointments must reflect "merit-based" decisions. But, in a telling passage, he

likens the examination process to athletics: "In certain athletic competitions, such as diving, figure skating, and gymnastics, the performance of competitors is judged on the basis of objective criteria but without comparison of the performance of each competitor relative to each other. Notwithstanding that competitors are judged independently and not relative to each other, each athlete is certainly 'competing' against the others, and the 'merit' of each competitor's performance is ascertained. [¶] Granted, . . . the competitors are assigned scores, which results in rankings. But the purpose of scores and rankings in such events is to determine the winner of the competition. In the civil service, however, the objective of the examination process is not to determine the 'winner' or to determine who is the best competitor relative to the others." Respectfully, we disagree. As the Engineers put it, "Competition does not allow the person who qualifies to run in the finals of a track meet to get the gold medal if he comes in tenth." Civil servants view CEA positions as desireable and strive to win them. The civil service system begins with the idea that competition provides the public the best servants in each position, and precludes spoils. (See *Kidd, supra,* 62 Cal.App.4th at p. 402 [eschewing rankings "renders the examination noncompetitive, emasculating the merit principle"].)

Ranking does not mean the highest scoring candidate receives the job; sometimes the appointing authority may choose among the top three candidates or top rank or top three ranks. (See §§ 19056-19057.4; *McGowan, supra,* 71 N.Y.2d at p. 734 [525 N.E.2d at p. 712, 530 N.Y.S.2d at p. 66] ["permissible for the appointing authority to be given room to consider the unmeasurable traits necessary for fulfillment of the duties"]; King, *supra,* pp. 3, fn. 6, 65 [rule of *three* protects appointing power's power to choose; rule of three *ranks* enables choices from broader pool]; *Civil-Service Commission,* 13 Ops. U.S. Atty. Gen. 516, 524-525 (1871) [seminal opinion holding that if a civil service board could force the appointing power to choose the top scorer, it would in effect usurp the discretion of the appointing power; instead, the board must present enough names to preserve the appointing power's discretion to make the final selection].) Those in the top ranges prove themselves better, as measured by the criteria applicable to that examination, than those nearer the bottom. (See *Kidd, supra,* 62 Cal.App.4th at p. 404 ["The Legislature did not intend for the Board to compromise the merit system (which the rule of three ranks is designed to safeguard)"].)

We reject an implication that ranking precludes the use of subjective criteria. "It would be perverse to sanctify rank ordering of exam scores in a quest to maximize competitiveness if, as a result, other considerations relevant to merit and fitness are discounted or swept aside[.]" (*McGowan,*

*supra,* 71 N.Y.2d at p. 734 [525 N.E.2d at p. 712, 530 N.Y.S.2d at p. 66].) We recognize evaluation of CEA candidates, more so than with other candidates, depends on subjective criteria, including the judgment of the appointing authority as to the applicant's allegiance to the administrative mission at hand. (See Musolf, *supra,* at p. 88; Hackett, *supra,* at p. 114 ["the requirement of a written examination in all cases is dropped and greater emphasis placed on the applicant's commitment to and support for the aims—as defined, presumably, by the incumbent elected administration—of the program he is to administer"].) The creators of the CEA system hoped in part to bypass entrenched bureaucrats in order to find managers committed to a given administration's goals, which necessarily requires (as with businesses) "consideration of many intangible attributes such as personality, initiative, ability to function as part of the management team and to motivate subordinates, and the ability to conceptualize and effectuate management style and goals." (*Pugh v. See's Candies, Inc.* (1988) 203 Cal.App.3d 743, 769 [250 Cal.Rptr. 195]; see *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 100-101 [69 Cal.Rptr.2d 900, 948 P.2d 412].) Inclusion of subjective factors does not preclude ranking of candidates, nor invite spoils where, as here, the examiners employ the same criteria to all, and publicize the use of subjective factors. (See Cal. Code Regs., tit. 2, § 548.41 [Board must publicize standards used]; *Almassy, supra,* 34 Cal.2d at pp. 398-399 ["The various aspects of the personality factors, as previously determined by the commission to be 'necessary and important' to the position to be filled, were itemized for consideration by the examiner as the measuring rod and guidepost in his evaluation process as to the personal fitness of the candidate, so that it cannot be said that there was no effective common criterion of base topics underlying the comparative ratings"].)

However, an examination measuring *only* purely subjective criteria would not be competitive. The dictionary defines "Competitive Civil Service Examination" in part as "Examination which conforms to measures or standards which are sufficiently objective to be capable of being challenged and reviewed by other examiners of equal ability and experience." (Black's Law Dict. (6th ed. 1990) p. 284, col. 2.) This is a near-verbatim quotation from a seminal New York case, *Fink v. Finegan* (1936) 270 N.Y. 356 [1 N.E.2d 462], followed by *Almassy, supra,* 34 Cal.2d at pages 398-403. (See also *Civil Service Comm. v. Frazzini* (1955) 132 Colo. 21, 29-37 [287 P.2d 433, 437-441] [relying, inter alia, on *Fink* and *Almassy*]; *Stoor v. City of Seattle* (1954) 44 Wash.2d 405 [267 P.2d 902] [also relying on *Fink* and *Almassy*].) Absent some objective standards, there would be no way to compare *relative merits* of candidates.

A leading treatise points out, "Unless the law requires [otherwise], it is usually required that the examinations be competitive examinations, if practicable, because selection of the most competent through competitive examination is the heart and purpose of civil service laws. [¶] A competitive examination has been defined as one which employs a standard or measure sufficiently objective so as to be capable of being challenged and reviewed by other examiners of equal ability and experience. [¶] Noncompetitive examinations are the exception and not the rule and are permitted only where it is not practicable to make the appointment by competitive examination. A [statutory] provision for a noncompetitive examination was held to be void where the [New York] constitution required a competitive examination. Competitive examinations may, on occasion, have some noncompetitive provisions or qualifications." (McQuillin, The Law of Municipal Corporations (3d ed. 2001) Elections, Officers and Employees, § 12.78.05, pp. 420-422, fns. omitted.) Although the Board and the Department explicitly argue a competitive examination does not require rankings, at bottom they impliedly contend a ranked examination (regardless of the label of "competitive") is impracticable for a CEA position. Some authorities allow exemptions where competition would be impracticable. (Field, Civil Service Law (1939) Examination, p. 85 (hereafter Field) ["whether or not an examination is practicable is a question of law"].) But those authorities are based on the applicable laws. (See, e.g., N.Y. Const., art. 5, § 6 ["merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall be competitive"]; *Fink v. Finegan, supra,* 270 N.Y. at pp. 360-361 [1 N.E.2d at p. 464].) The California Constitution allows some exemptions, as explained above (deputies, elected officers and so forth), and others should not be implied. (See *Schweisinger v. Jones* (1998) 68 Cal.App.4th 1320, 1326 [81 Cal.Rptr.2d 183] [term limitation contained in California Constitution had a specified exception, therefore "other exceptions are precluded by the doctrine, *expressio unius est exclusio alterius*"]; see also *Sullivan v. Finegan* (1937) 163 Misc. 755 [296 N.Y.S. 540] [New York Constitution allowed veteran exemption, statute providing for another exemption invalid], affd. 275 N.Y. 479 [11 N.E.2d 307].) Moreover, the statutes governing selection for CEA positions permit relaxation of some features of ordinary civil service examinations, but retain the requirement of a competitive examination. (§§ 19889.2 ["regular civil service" selection rules do not apply "unless the application is provided by State Personnel Board rule"], 19889.3 ["Eligibility . . . shall be established as a result of competitive examination"].) Our statutes do not provide an impracticability exemption from competitive examinations.

A particular ground for finding a competitive (that is, ranked) examination "impracticable" is when the position involved is "confidential." That appears

to be part of the claim herein, that the nature of a CEA (a policymaking official) is such that rankings are impracticable. Many civil service systems allow exemptions for confidential employees. (See Field, *supra*, Classification, pp. 71-74.) "Whether a confidential employee is exempt or not depends upon the statute or charter; the fact that the position is one involving duties and relationships of a confidential nature does not in and of itself render the position exempt from the normal provisions applicable to the competitive classified service." (*Id.* at p. 71, fn. omitted.) As stated above, the California Constitution does not exempt CEA's. Nor do the CEA statutes. Nor could they, given the Constitution.

At oral argument it was suggested that "competition" can mean different things in different contexts and the judiciary should defer to the Board's reasoned decision to create an examination open to a broad range of candidates, evaluated with procedural fairness and including the appeal rights provided by the CEA system, but one not including rankings. This facially deferential approach would in fact amount to an abdication of our responsibility to enforce the People's will as expressed in the 1934 initiative and in the implementing statutes. Although the unbroken line of authorities described above (including decisions of this court in *Kidd, supra,* 62 Cal.App.4th 386, and *Alexander, supra,* 80 Cal.App.4th 526, and of the California Supreme Court in *Almassy, supra,* 34 Cal.2d 387, among other decisions) should ordinarily suffice, given the earnest assertion that the CEA statute uses the term "competitive" in a way which allows unranked examinations, we point out the history of the civil service reform movement precludes any interpretation of "competitive examination" which eschews an assessment of the relative merits of candidates.

In 1853, so-called pass examinations were instituted as a condition of appointment to some federal positions. We would call them "pass-fail" examinations, designed to discriminate between qualified and unqualified applicants, but not to discriminate among the qualified applicants. (Van Riper, *supra*, p. 52; White, The Republican Era: 1869-1901; A Study in Administrative History (1958) p. 284 (White); Shafritz, Public Personnel Management: The Heritage of Civil Service Reform (1975) p. 16 (Shafritz).) "Such examinations took the form of 'pass' examinations; there was no real competition, and they served at best the single purpose of keeping the utterly incompetent out." (Kingsley, Public Personnel Administration (3d ed. 1950) p. 22.) The "competitive examination" was designed to do more, to institute "a simple mode of ascertaining the relative theoretical qualifications of applicants for office . . . ." (Clarke, Civil Service Law (2d ed. 1891) p. 26; see Van Riper, *supra,* pp. 98-99, 104.)

For our purposes it is enough to observe that the use of the expression "competitive examination" historically excluded the notion of a "pass-examination." Essentially, the Board here wants to employ a pass-examination.

The requirement of a "competitive examination" for a CEA applicant was present when the CEA system was adopted in 1963. (See Stats. 1963, ch. 1816, § 1, p. 3742.) It is still present today. (§ 19889.3.) Nothing in the CEA statutes suggests that "competitive examination" under the CEA system means something different from the term "competitive examination" used elsewhere in the civil service statutes. (See § 18930; and see Stats. 1937, ch. 753, § 83, p. 2095.)

■ A venerable rule of statutory construction informs that when a term of art has been judicially construed, a subsequent legislative enactment using that term is presumed to employ that judicial construction, absent some indication in the statute to the contrary, particularly where the statutes touch on the same area of the law. (See *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 675 [254 Cal.Rptr. 211, 765 P.2d 373]; *Union Oil Associates v. Johnson* (1935) 2 Cal.2d 727, 734-735 [43 P.2d 291, 98 A.L.R. 1499]; *Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1107 [1 Cal.Rptr.2d 222].) "Where [statutes] make use of words and phrases of a well-known and definite sense in the law, they are to be received and expounded in the same sense in the statute." (*Harris v. Reynolds* (1859) 13 Cal. 514, 518.)

■ Section 19889.3 itself seems to recognize the difference between a determination of minimal fitness and a competitive examination. It provides for a "competitive examination of persons . . . who meet such minimum qualifications as the State Personnel Board may determine are requisite to the performance of high administrative and policy influencing functions." Thus, the Board has the power to define the "minimum qualifications" necessary to be considered for a CEA position. Out of those persons, a competitive examination must then be held. As stated, the term "competitive examination" excludes the idea of a pass-examination. Therefore, a statute calling for competitive examinations does not authorize the regulation allowing the use of noncompetitive examinations. The regulation is invalid under the statute.

There is a further point to consider. At oral argument the suggestion was made that the appeal right precludes awarding a CEA job to an applicant on the basis of patronage and therefore rankings are not *necessary*. Apart from the discussion above regarding the meaning of the statutory term "competitive examination," which shows rankings are, indeed, necessary, we point out that absent rankings an appeal would be futile.

An example posed at oral argument is worth discussing in this connection. Suppose a CEA position was vacant and a nonranked examination was given. Out of 100 applicants, 50 passed the examination. One applicant was given the job, and one or more applicants appealed, claiming the appointee was a political contributor, but otherwise less qualified for the job than noncontributors. We accept the view that the challengers could appeal the appointment to the Board, claiming it was made in violation of the regulations because political contributions could not form a legitimate "qualification" for use in the CEA examination. (See Cal. Code Regs., tit. 2, former § 548.40.) But *how could they prove it?* Because the appointing power has no need to compare the relative merits of the candidates, how could the challengers begin to show the basis for their claim, apart from showing that the successful applicant indeed had made a political contribution to the party in power? That fact alone would not disqualify the applicant nor in most cases even raise an inference of impropriety. The challengers would have no practical way to meet their burden to show the appointment of a minimally qualified, but less qualified person was based on improper political considerations. Spoils could reemerge.

Now, suppose the examination had been "competitive" in the sense we have used the term, and the results were expressed in several ranks. Assuming no rule of three or rule of three ranks applied to CEA's, the appointing authority could still choose any of the 50 passing candidates. The appointing authority might choose No. 48 out of 50. But if it did so, there would be a tangible record. Such evidence, coupled with evidence of political contributation by No. 48, would raise an inference of impropriety. Then the appointing authority could explain the basis of its decision. There might be a legitimate basis for the appointment, but the point is with rankings, the issue can be litigated. The appeal would be operative in the sense that there would be a fair chance of unearthing misconduct, if misconduct occurred. Where scoring takes place, a dissatisfied applicant can at least make out a statistically sound basis for an appeal. (See *In re Crowley* (1984) 193 N.J.Super. 197, 201 [473 A.2d 90, 92] ["Since appellant had twice been bypassed by individuals with less experience and a lower numerical rank and inasmuch as his district supervisor had informed him that his work was satisfactory and that there was nothing derogatory against him, appellant alleged that he had been bypassed because he was a union shop steward and former chapter secretary"; *id.* at p. 214 [473 A.2d at p. 100] [rule of three allows bypassing highest candidate, but matter remanded for hearing to adjudicate the claim of anti-union bias].) Our point is not to foment litigation by state workers who fail to obtain a plum job, but to point out that if something untoward does occur, a remedy exists to correct the problem. Absent rankings, as explained

above, resort to an appeal would be futile in nearly all cases, simply because there would be no objective record (that is, *ranking*) of how the candidates compared to each other on different factors.

We add that most public employment testing and selection in California is conducted by efficient, dedicated public officers. However, misconduct is not an abstract threat, nor something relegated to the pages of history. (See, e.g., Shafritz, *supra*, pp. 1-3.) In the recent past in California there have been instances of misconduct in competitive examinations, and in some cases proof of such unlawful conduct would have been made impossible or at least far more difficult, absent the evidence and presumptions provided by the rankings of "competitive" examinations. (See, e.g., *Ravenswood Teachers Assn. v. Ravenswood City Sch. Dist.* (1986) 10 Cal. Pub. Employee Rptr. 17059 [test scores skewed to disqualify a union candidate]; *State Employee Trades Council v. State of California* (1982) 6 Cal. Pub. Employee Rptr. 13089 [pattern of anti-union conduct leading to a poor rating, giving rise to inference of impropriety]; see also *Kidd, supra*, 62 Cal.App.4th 386 [racial and gender discrimination proven based on evidence of alterations to test scores].)

Thus, we return to the origin of the "competitive" examination: Its purpose was (and is) to provide accurate information to the hiring authority about the *relative* merits of the candidates, but not unfairly (or unconstitutionally) circumscribe the appointing power's ability to make the actual selection. Contrary to the view expressed at oral argument, rankings *are* a necessary component of a "competitive" examination, for absent ratings the examination becomes a "pass-examination" which only minimally prevents spoils to the extent it weeds out the patently unfit. That is not the system adopted in California, where, by legislation implementing the initiative, a "competitive" examination is required. Absent such an examination, spoils is made more likely. This would frustrate the purpose of the initiative, to " 'eliminat[e] *as far as possible* the "spoils system," ' " as set forth in the ballot pamphlet quoted earlier. (*PLF, supra*, 29 Cal.3d at p. 183, fn. 6, italics added.) We cannot put it better than Teddy Roosevelt: "[N]on-competitive examinations serve only as a cloak to hide the nakedness of the spoils system. Pass-examinations or non-competitive examinations are absolutely useless as checks upon patronage appointments.' " (White, *supra*, p. 316, fn. omitted.)

Finally, and tellingly, nobody has cited to this court any authority equating a "competitive examination" with a pass-fail examination, which eliminates rankings and merely weeds out the patently unfit. Such result would

turn the clock back on civil service reform to 1853 and allow spoils. We reject such result.

## B. *Transfers.*

In a concise argument the Engineers urge: "Appointments to CEA positions through 'transfer' are clearly unconstitutional. Article VII, Section 1(b) makes 'competitive examination' mandatory. In addition, these regulations are violative of Government Code Section 19889.3, which similarly requires appointment through competitive examination."

One Board regulation provides: "With the approval of the executive officer" an appointing authority may transfer an employee from one CEA position "to another at substantially the same or lower level of salary." (Cal. Code Regs., tit. 2, § 548.95.) Another provides: "With the approval of the executive officer, and the concurrence of the affected employee, an appointing power may transfer an employee who has permanent status in a position in the general civil service in the class from which transfer will occur to a position in the career executive assignment category which is at substantially the same level of salary as the general civil service class. Such transfer may, with the written approval of all parties, be made between appointing powers." (*Id.*, § 548.96.)

The Department maintains "the Board is constitutionally empowered to determine that 'from' and 'to' classifications involved in a transfer are so similar that an examination for, and performance in, the former demonstrates the appointee[']s qualifications and fitness for the latter." In short, "two examinations are unnecessary to determine merit, efficiency and fitness when classifications are comparable."

"Transfer" means "The appointment of an employee to a position in a different class that has substantially the same level of duties, responsibility, and salary, as determined by board rule, under the same or another appointing authority." (§ 18525.3, subd. (b).) "A transfer, as defined in Section 18525.3, may be accomplished without examination. The board may require an employee to demonstrate in an examination that he or she possesses any additional or different requirements that are included in the minimum qualifications of the class to which the employee is transferring." (§ 19050.4.)

In *Noce v. Department of Finance* (1941) 45 Cal.App.2d 5, 10 [113 P.2d 716] (*Noce*), we held an appointing authority could transfer an employee from one civil service classification to another—where the duties and salary of the positions were substantially similar. The Board had two classifications

for pressmen, one for use of older cylinder presses and one for use of newer offset presses. A statute provided persons who operated replaced machinery would receive "the position of operating" the new machines, if able, or receive training to operate them, if not. (*Id.* at pp. 8-9.) We declined to interpret the statute as automatically changing the *classification* of the employee to a position "which requires different training, qualifications and duties without examination. That would be in direct conflict with the clear language and the very spirit" of the civil service provisions of the Constitution. (*Id.* at p. 10.)

■ We reject the claim a new examination must occur before transferring a person from one CEA position "to another at substantially the same or lower level of salary." (Cal. Code Regs., tit. 2, § 548.95.) This does not invite spoils, but the efficient transfer of able CEA appointees. If a transfer occurs for political reasons, the Board can undo it: The Engineers have not shown a facial flaw in such transfers.

■ A more difficult issue arises with the regulation allowing a person to become a CEA appointee without ever taking an examination *for any CEA position*. Only a permanent civil servant may become a CEA appointee and, presumably, such person took a competitive examination to reach his or her current civil service position. The regulation allows conversion of a vacant position into a CEA position, and the subsequent transfer of a civil servant into such CEA position, without examination. Before converting a position, the Department, subject to review by the Board, must determine it qualifies as a position "of a high administrative and policy influencing character." (§ 19889.)

In our view the very act of converting the position into a CEA position alters its character and makes it unlike *non-CEA* positions. Although, painted with a broad brush, the position (pre- and postconversion) may involve the same general duties (e.g., managing a particular program), the position assumes a distinct character when it becomes a CEA position.

A memorandum from the Board details the reason for the adoption of the regulation allowing non-CEA appointees to transfer into a CEA position. In the course of describing a variety of modifications to the CEA system, the memorandum explains: "Incumbents of 'parallel' civil service classes will have the opportunity to transfer to the 'parallel' Career Executive Assignment level. This transfer may become desirable due to the proposed changes described in this package as well as possible future changes such as additional fringe benefits. The staff believe that incumbents of general civil service classes which are parallel to C.E.A. levels should also be given the

opportunity to benefit from these program improvements since they are assuming executive-level responsibilities. . . . A new State Personnel Board Rule 548.96 . . . is proposed for this purpose. The Rule provides for transfer similar to the transfer procedure used in general civil service." (Cal. State Personnel Board, Proposed CEA Program (Nov. 19, 1973) p. 47; see *id.* at p. 68.) But if persons assume new "executive-level responsibilities," such persons assume dissimilar positions, and transfers without examination would transgress the merit principle.

But, as in *Noce, supra,* 45 Cal.App.2d 5, we reach this conclusion without finding *constitutional* infirmity in the regulations. Section 19889.3, part of the CEA statutes, provides: "Eligibility for appointment to positions in the career executive assignment category shall be established as a result of competitive examination . . . ." We read this statute to require a competitive examination (that is, a *ranked* examination) before transferring a non-CEA employee into a CEA position. A contrary reading would erode the constitutional merit principle. We reject this result. (See *Ex parte Lorenzen* (1900) 128 Cal. 439-440, quoting Justice Field's decision in *United States v. Kirby* (1868) 74 U.S. (7 Wall.) 482, 486-487 [19 L.Ed. 278, 280].) We eschew an interpretation creating a constitutional doubt, if possible. (*Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 60 [195 P.2d 1]; *Walton v. City of Red Bluff* (1991) 2 Cal.App.4th 117, 132 [3 Cal.Rptr.2d 275].)

We agree with the Department that many employee classifications overlap with other classifications, that "it is not practical to require examinations before each and every appointment to reaffirm employee fitness," and different good reasons exist for different types of employee transfers, even between positions with similar duties and salaries. But the Engineers do not challenge the many types of ordinary employee transfers described in the Department's brief, they challenge the purported power to transfer a non-CEA employee into a CEA position, without any competitive *CEA* examination.

The general transfer authority provided by section 19050.4 does not authorize a regulation dispensing with competitive examinations for non-CEA employees moving into CEA positions because of the distinct character of the latter. (Cf. § 18525.3, subd. (b).) Instead, as stated, we construe the more specific statute, section 19889.3, to require competitive examinations. Accordingly, the regulation (Cal. Code Regs., tit. 2, § 548.96), as construed by the Department to eliminate the need for examinations before transferring a non-CEA appointee into a CEA position, exceeds statutory authority. (See *Caldo Oil Co. v. State Water Resources Control Bd.* (1996) 44 Cal.App.4th 1821, 1827 [52 Cal.Rptr.2d 609].)

The Department suggests this conclusion creates an administrative burden. We cannot agree the burden caused by giving examinations prior to transfers justifies trenching on the bulwark of the merit principle, viz., the competitive examination. The CEA examination "may be assembled or unassembled, written or oral, or in the form of a demonstration of skill, or any combination of these; and an investigation of character, personality, education and experience and any tests of intelligence, capacity, technical knowledge, manual skills, or physical fitness which the appointing power subject to the approval of the executive officer deems are appropriate, may be employed. [¶] . . . Examinations may range from (1) a review of applications from which a selection is made, to (2) the use of supplemental applications, appraisal of performance and executive potential, management exercises and/or structured interviews." (Cal. Code Regs., tit. 2, former § 548.40.) This definition allows great flexibility and informality in the conduct of examinations, e.g., reviewing resumes. This is often referred to as a "nonassembled" (or, in this regulation, "unassembled") examination. Such examinations have been used for over a hundred years. (See Van Riper, *supra*, p. 140.) There is no support in the record for the contention that requiring a competitive examination prior to transfers into CEA positions will prove administratively onerous.

## VI. *Conclusion.*

The judgment in this case concluded the CEA system as a whole did not violate the California Constitution, a conclusion with which we agree. The CEA system—in large—does not contravene the "merit principle," nor reinstate a spoils system, nor result in illegal temporary or illegal permanent appointments and does not transgress the general system requirements of the California Constitution. However, a non-CEA employee may not transfer into a CEA position without a competitive examination; accordingly, a contrary regulation (Cal. Code Regs., tit. 2, § 548.96) violates the implementing statutes. Further, a competitive examination, as explained above, requires consideration of the relative merits of the competitors and a regulation stating otherwise (Cal. Code Regs., tit. 2, former § 548.40) also violates the implementing statutes. (See also *Alexander, supra*, 80 Cal.App.4th at pp. 543-544.) These latter two points are not reflected by the judgment. This opinion declares the rights of the parties and we need not remand. (*Haley v. L. A. County Flood Control Dist.* (1959) 172 Cal.App.2d 285, 294 [342 P.2d 476].)

We are aware that the Board has amended the regulation at issue in response to *Alexander, supra,* 80 Cal.App.4th 526. This opinion should not be read to express any view on the current version of the regulation.

## DISPOSITION

The judgment, as modified by this opinion, is affirmed. Each party is to bear its own costs.

Hull, J., concurred.

**SCOTLAND, P. J.,** Dissenting.—I disagree with much of my colleagues' analysis. In my view, the majority opinion constitutes unwarranted judicial second-guessing of decisions of the legislative and executive branches of government—second-guessing not compelled by the Constitution—and lacks an appreciation of the role of career executives in state government and the need for latitude in the selection of persons for career executive assignments. For reasons that follow, I conclude the trial court got it right in rejecting all of plaintiffs' challenges to career executive assignments. Hence, I would affirm the judgment in its entirety.

### I

The positions at issue may be defined by reference to the following statutory provisions:

" 'Career executive' means an employee appointed from an employment list established for the express purpose of providing a list of persons with permanent status in the civil service who are available for career executive assignments, in which selection, classification, salary, tenure, and other conditions of employment may be varied from those prevailing . . . for other employees in the state civil service." (Gov. Code, § 18546.)

" 'Career executive assignment' means an appointment to a high administrative and policy influencing position within the state civil service in which the incumbent's primary responsibility is the managing of a major function or the rendering of management advice to top-level administrative authority. Such a position can be established only in the top managerial levels of state service and is typified by broad responsibility for policy implementation and extensive participation in policy evolvement. Assignment by appointment to such a position does not confer any rights or status in the position other than provided [in section 19889 et seq.]." (Gov. Code, § 18547.)

Career executive assignments (CEA's), and the employees who hold these positions, are treated differently from other state positions and employees in the manner of their selection and in the continuation of their appointments.

Plaintiffs' challenges to the CEA employment scheme fall into the broad categories of (1) attacks on the nature of the position and (2) attacks on the manner in which vacancies are filled.

## II

Plaintiffs begin by claiming that different treatment of CEA positions creates a "special system" for CEA's, and thus violates the constitutional requirement of a "general system" of civil service. (Cal. Const., art. VII, § 1, subd. (b).)

Plaintiffs seem to believe that all employees must be treated identically, regardless of inherent differences in their positions. The simple answer is that the constitutional requirement that a law be general does not preclude the Legislature from making reasonable classifications. (*Lelande v. Lowery* (1945) 26 Cal.2d 224, 232 [157 P.2d 639, 175 A.L.R. 1109].) The Legislature has broad discretion to determine when classifications for differing treatment bear a rational relationship to a lawful state purpose. (*Estate of Horman* (1971) 5 Cal.3d 62, 75 [95 Cal.Rptr. 433, 485 P.2d 785].) A law is general when it applies equally to all persons within a legislative classification. (*Lelande v. Lowery, supra*, 26 Cal.2d at p. 232.) Nothing in the requirement of a "general system" of civil service laws precludes the Legislature from making reasonable classifications for differing treatment within the system, so long as the laws apply uniformly within classifications.

## III

Among other things, plaintiffs assert that CEA appointments are unconstitutional because CEA's are not "permanent" as required by the California Constitution, which provides that permanent appointment and promotion must be under a general civil service system, and limits temporary appointments to no more than nine months in a 12-month period. (Cal. Const., art. VII, §§ 1, 5.)

Because CEA's are not limited to nine-month periods, they are not "temporary" appointments within the meaning of article VII, section 5 of the Constitution. Nevertheless, plaintiffs' argument falters on the assumption that "permanency" must mean the same thing for every position or class of positions. In fact, the Constitution does not define "permanent," nor does it identify the attributes that are essential to a permanent position.

"Permanent" is a word of somewhat flexible meaning. (*In re Eleanor A.* (1978) 84 Cal.App.3d 184, 189 [148 Cal.Rptr. 315].) While "permanent" is

the antonym of "temporary," it is not the equivalent of perpetual or unending or lifelong or unchangeable or existing forever. (*Ibid.*)

It is true that an employee in a CEA position lacks the full range of protections accorded civil servants.[1] However, the employee is not wholly without attributes of permanency. CEA appointment follows a competitive examination; is for an indefinite period; and cannot be terminated based upon age, vision impairment, sex, race, religious creed, color, national origin, ancestry, marital status, physical or mental disability, opposition to unlawful employment practices, participation in an investigation, proceeding or hearing on a charge of discrimination, or on a change in appointment based upon political or religious opinion or affiliation. (See *Campbell v. State Personnel Bd.* (1997) 57 Cal.App.4th 281, 292 [66 Cal.Rptr.2d 722].)

Accordingly, in my view, CEA positions bear sufficient attributes of "permanency" as to be within legislative discretion in the implementation of a constitutional provision calling for undefined "permanent appointment and promotion." (See *Cronin v. Civil Service Com.* (1925) 71 Cal.App. 633, 643-646 [236 P. 339].) In light of the Legislature's wide discretion to classify and treat differently those positions that are subject to distinction on a natural, intrinsic, or constitutional basis (*Lelande v. Lowery, supra,* 26 Cal.2d at p. 232), I conclude the Legislature acted within its discretion in establishing different attributes of permanency for this particular class of position.

## IV

Plaintiffs also claim that, at the time of the trial court's ruling, the method of selecting CEA's was unconstitutional because an appointing power was not required to numerically rank those who undertake the examination. I disagree.

In establishing the category of CEA's, the Legislature delegated to the State Personnel Board (Board) the responsibility of establishing by rule a system of merit personnel administration specifically suited to the selection and placement of executive personnel. (Gov. Code, § 19889.) In doing so, the Legislature indicated an intent that persons appointed to CEA positions be "well-qualified and carefully selected." (*Ibid.*)

While CEA positions are subject to a merit system, the Legislature provided that the usual rules governing the selection, classification, and

---

[1]The employee is a permanent civil servant with the full range of civil service protections against termination from employment at the level of the non-CEA position held previously; it is only termination of the CEA position, and resultant return to non-CEA status, that is not subject to the full range of usual civil service protections.

tenure of civil service employees shall not apply unless the Board provides otherwise by rule. (Gov. Code, § 19889.2.) The Legislature also provided that "[e]ligibility . . . to positions in the career executive assignment category shall be established as a result of competitive examination of persons with permanent status in the civil service who meet such minimum qualifications as the State Personnel Board may determine are requisite to the performance of high administrative and policy influencing functions." (Gov. Code, § 19889.3.)

In implementing these provisions, the Board promulgated the following rule, which was in effect at the time the dispute in this case arose:

"Examinations for appointment to Career Executive Assignment positions shall be competitive and of such character as fairly to test and determine the qualifications, fitness and ability of competitors actually to perform the duties of the position to be filled. Examinations may be assembled or unassembled, written or oral, or in the form of a demonstration of skill, or any combination of these; and an investigation of character, personality, education and experience and any tests of intelligence, capacity, technical knowledge, manual skills, or physical fitness which the appointing power subject to the approval of the executive officer deems are appropriate, may be employed.

"It is the purpose of this selection system to provide examination options that are particularly suited to fill efficiently each vacant position. Examination results need not be expressed in specific ratings of individuals. The person appointed as a result of a competitive examination must be well qualified and carefully selected. The appointing power is required to promulgate the qualifications that will be used as standards in conducting the examination but is not required to distinguish between groups or individuals as to who is qualified or not qualified or as to relative level of qualification. Examinations may range from (1) a review of applications from which a selection is made, to (2) the use of supplemental applications, appraisal of performance and executive potential, management exercises and/or structured interviews." (Cal. Code Regs., tit. 2, former § 548.40.)

Relying upon this court's decision in *Kidd v. State of California* (1998) 62 Cal.App.4th 386 [72 Cal.Rptr.2d 758] (*Kidd*), and the California Supreme Court's earlier decision in *Almassy v. L. A. County Civil Service Com.* (1949) 34 Cal.2d 387 [210 P.2d 503] (*Almassy*), plaintiffs contend that competition requires ranking and, thus, that the above quoted regulation is inconsistent with the constitutional and statutory requirements of competitive examination. But *Kidd* and *Almassy* are of no assistance to plaintiffs.

*Kidd* was concerned with a Board regulation establishing a supplemental certification procedure based upon race and gender. The basic hiring procedures involved in that case provided for competitive examination with ranking according to performance, and limited employment to those in the top three ranks. (*Kidd, supra,* 62 Cal.App.4th at p. 393.) The supplemental certification procedure operated in disregard of established hiring procedures by adding to the list of eligible hirees, solely on the basis of race or gender, individuals who failed to perform well enough to be in the top three ranks. (*Ibid.*) In this respect, the supplemental certification procedure did not merely establish a preference for certain persons among equally qualified individuals; rather, it constituted a preference for lower qualified persons over better qualified individuals based upon nonmerit factors. (*Id.* at p. 392.)

*Kidd* found no constitutional or statutory authority for the Board to override the merit system by reference to race and gender: "The Board's supplemental certification regulation injects racial, ethnic and sexual qualifications into a hiring system whose constitutional basis commands that race, ethnicity and sex be disregarded. Because the merit principle is intended to reward merit ascertained by competitive examination, that principle is utterly inconsistent with color blindness for some and color consciousness for others." (*Kidd, supra,* 62 Cal.App.4th at p. 402.)

Thus, the infirmity in the regulation at issue in *Kidd* was the interjection of inappropriate, nonmerit factors into the hiring process in disregard of the established procedures for competitive examination. The established procedures involved in that case included the ranking of competitors, and the discussion in *Kidd* subsumed the fact the Legislature already had determined that, in the employment categories at issue, ranking of competitors was the appropriate method for carrying out the constitutional requirement of competitive examination.

Because *Kidd* was not required to consider whether ranking of competitors is essential to a competitive examination process in all circumstances, it does not compel the conclusion urged by plaintiffs.

Similarly, *Almassy* involved a county civil service selection procedure that embraced the ranking of candidates. The plaintiff, who received a failing grade, challenged the procedures insofar as they included an oral interview and a confidential report from the candidate's department head. *Almassy* concluded that, although use of oral interviews and confidential reports would involve subjective evaluation, the county civil service commission was within its discretion in utilizing those procedures. (*Almassy, supra,* 34 Cal.2d at pp. 398-405.)

As was the situation in *Kidd,* the court in *Almassy* was not required to determine whether ranking is an essential element of a competitive examination in all cases.

For reasons that follow, I conclude numerical ranking is not an essential requirement for the CEA selection process.

CEA positions are required by both constitutional and statutory provision to be filled through competitive examination. (Cal. Const., art. VII, § 1, subd. (b); Gov. Code, § 19889.3.) However, plaintiffs have not cited, and I have not identified, specific authority for the proposition that a numerical ranking of competitors is an essential element of a competitive examination in all instances.

The requirement of competition, standing alone, does not compel the conclusion urged by plaintiffs. In this respect, I note that "competition" is generally defined as "the act or action of seeking to gain what another is seeking to gain at the same time and usu[ally] under[,] or as if under[,] fair or equitable rules and circumstances" and/or "a common struggle for the same object esp[ecially] among individuals of relatively equal standing." (Webster's 3d New Internat. Dict. (1976) p. 464.)

Although, as discussed by the parties, a sports analogy with scoring and ranking provides one relevant example of competition, it does not demonstrate a universal understanding of the concept. To the contrary, society often speaks of "competition" in ways that do not imply formal scoring or ranking of competitors, particularly with respect to business, economics, and employment situations. (See, e.g., *Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2d 327 [49 Cal.Rptr. 825, 411 P.2d 921, 24 A.L.R.3d 795] [unfair competition]; *A-Mark Coin Co v. General Mills, Inc.* (1983) 148 Cal.App.3d 312, 323 [195 Cal.Rptr. 859] [tort defense of free competition]; *Charles C. Chapman Building Co. v. California Mart* (1969) 2 Cal.App.3d 846, 855 [82 Cal.Rptr. 830] [same].)

Because the word "competition" does not necessarily imply scoring and ranking, the position urged by plaintiffs has no merit unless the public employment context necessitates that scoring and ranking be read into the constitutional requirement. In this respect, courts must be mindful of our limited judicial role.

In establishing the state civil service, the Constitution is terse. Article VII, section 1, subdivision (a) provides: "The civil service includes every officer and employee of the State except as otherwise provided in this Constitution."

Subdivision (b) provides: "In the civil service permanent appointment and promotion shall be made under a general system based on merit ascertained by competitive examination." In sections 2 and 3, article VII establishes the Board as a nonpartisan entity to enforce and administer the civil service laws.

These brief and straightforward provisions are not intended to engrave on the Constitution particular aspects of a civil service system or to restrict the Legislature to any particular mode of personnel administration. (See *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 184, fn. 7, 194 [172 Cal.Rptr. 487, 624 P.2d 1215].) Rather, "the 'sole aim' of [those provisions] was to establish, as a constitutional mandate, the principle that appointments and promotions in state service be made solely on the basis of merit." (*Id.* at pp. 183-184; see also *State Personnel Bd. v. Fair Employment & Housing Com.* (1985) 39 Cal.3d 422, 436 [217 Cal.Rptr. 16, 703 P.2d 354].) Having established this merit principle as a matter of constitutional law, the provisions leave the Legislature with a free hand to fashion laws relating to personnel administration for the best interests of the state. (*Pacific Legal Foundation v. Brown, supra,* at p. 184.)

Although the Legislature has determined that, in most instances, the requirement of competitive examination should be accomplished through scoring and ranking of candidates (Gov. Code, §§ 19056-19057.4), it has authorized the Board to create a system of selection for CEA positions that need not conform to the usual methods of selection (Gov. Code, § 19889.3). The Board determined that scoring and ranking is not required. (Cal. Code Regs., tit. 2, former § 548.40.) The Legislature has not seen fit to interfere with the Board's decision.

Hence, the Legislature and the Board determined that, with respect to the limited category of CEA positions, competitive examinations do not require scoring and ranking. That determination is entitled to a presumption of constitutionality, and any doubts must be resolved in favor of the exercise of authority by the Legislature and the Board. (*Pacific Legal Foundation v. Brown, supra,* 29 Cal.3d at p. 180; *Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1217-1221 [70 Cal.Rptr.2d 745]; and see *Almassy, supra,* 34 Cal.2d at p. 396.)

Where, as here, the challenged provision was adopted with the relevant constitutional prescriptions in mind, and the plaintiffs contend that the provision is unconstitutional on its face, the plaintiffs bear a heavy burden in attempting to demonstrate such unconstitutionality. (*Pacific Legal Foundation v. Brown, supra,* 29 Cal.3d at pp. 180-181.) To meet this burden, they

must demonstrate that the challenged provision inevitably poses a present total and fatal conflict with applicable constitutional prohibitions. (*Ibid.*)

The Constitution requires that appointment and promotion be based upon merit ascertained by competitive examination, but it does not purport to provide any minimum requisites that will render an examination competitive. From my review of the relevant authorities, I am unable to distill a minimum formula that, in all instances, is either essential or sufficient to make an employment examination competitive.

One fundamental requisite of a competitive examination is that it be open to all who meet the minimum requirements for candidates, as distinguished from a mere qualifying examination for previously picked candidates. (*Almassy, supra*, 34 Cal.2d at p. 398.) The candidates should be tested under common criteria. (*Id.* at p. 399.) The examinations must be conducted under standards which make the competition fair to all candidates. (*Id.* at p. 404.) This requires that relevant standards be established before testing rather than left to the whim of the examiner. (*Id.* at p. 398.) And, of course, the standards established must be relevant to the position sought. (*Id.* at p. 400; see *Kidd, supra*, 62 Cal.App.4th at p. 402.)

Within these general limitations, the Legislature and the Board, "in working out the problem of measuring the candidates' suitability for the position to be filled, should not be proscribed in adopting a method of selection which [they deem] best calculated to produce the desired result." (*Almassy, supra*, 34 Cal.2d at p. 404.) In other words, as previously noted, the constitutional imposition of the merit principle was not intended to tie the hands of the Legislature and the Board in fashioning a method of selection appropriate to the job or the class of position at issue. (*State Personnel Bd. v. Fair Employment & Housing Com., supra*, 39 Cal.3d at p. 436; *Pacific Legal Foundation v. Brown, supra*, 29 Cal.3d 194.)

The Board's regulatory scheme for the examination and appointment of persons to CEA positions requires the appointing power to promulgate, in advance, the qualifications that will be used as standards in the examination. (Cal. Code Regs., tit. 2, former § 548.40.) The examination announcement must identify the position to be filled and the evaluation standards and methods to be applied. (Cal. Code Regs., tit. 2, § 548.41.) It is the Board's policy that examinations be publicized as widely as appears practicable, and there must be reasonable assurance that potential competitors are provided an opportunity to be informed of their general nature and scope. (*Ibid.*) The examination process is subject to the oversight of the Board's executive

officer. (Cal. Code Regs., tit. 2, §§ 548.30-548.41.) Following examination, the person appointed must be well qualified and carefully selected. (Cal. Code Regs., tit. 2, former § 548.40.) The method or methods by which the examination was conducted must be made available to competitors upon request. (Cal. Code Regs., tit. 2, § 548.43.) Unsuccessful competitors may appeal to the Board on the grounds of irregularity, fraud or discrimination in the conduct of the examination, and may challenge the qualifications of the person appointed on grounds he or she is not well qualified and/or was not carefully selected. (Cal. Code Regs., tit. 2, § 548.49.)

In assessing the sufficiency of these examination procedures, courts must keep in mind we are dealing with a limited category of management positions that are of a high administrative and policy-influencing character. Courts have long recognized that, as a matter of practical necessity, employers must be accorded substantial discretion with respect to high-level employment positions of a sensitive managerial or confidential nature. (See *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 100-101 [69 Cal.Rptr.2d 900, 948 P.2d 412]; *Pugh v. See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 330 [171 Cal.Rptr. 917].)

"Measuring the effective performance of such an employee involves the consideration of many intangible attributes such as personality, initiative, ability to function as part of the management team and to motivate subordinates, and the ability to conceptualize and effectuate management style and goals." (*Pugh v. See's Candies, Inc.* (1988) 203 Cal.App.3d 743, 769 [250 Cal.Rptr. 195]; see also *Cotran v. Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at p. 101.)

This is no less true with respect to employees in high administrative and policy-influencing positions in public employment. The examination and appointment provisions for CEA positions recognize the need for flexibility and discretion in making high-level managerial appointments while requiring procedures—such as the advance promulgation of criteria and methodology, wide dissemination of examination notices, and the right to postappointment review by the Board—to ensure that the process remains competitive.

The civil service includes a vast array of jobs and positions. Some jobs lend themselves well to objective testing, while in other cases subjective evaluation is necessary. (See *Almassy, supra,* 34 Cal.2d at pp. 398-399.) Indeed, the majority opinion rejects the claim that competitive testing cannot include subjective criteria.

Similarly, the selection process for some positions lends itself well to numerical rating and ranking of applicants. But, as the majority opinion

recognizes, "[r]anking does not mean the highest scoring candidate receives the job; sometimes the appointing authority may choose among the top three candidates or top rank or top three ranks." (See Gov. Code, §§ 19056-19057.4.) It does not appear that the "rule of three" candidates or ranks has ever been rejected by the courts. (See, e.g., *Kidd, supra,* 62 Cal.App.4th 404; *Sharp v. Civil Service Com.* (1993) 14 Cal.App.4th 1507, 1511 [18 Cal.Rptr.2d 407]; *Dawn v. State Personnel Board* (1979) 91 Cal.App.3d 588, 591-592 [154 Cal.Rptr. 186].) Yet if, as plaintiffs contend and the majority opinion concludes, formalized scoring and ranking are essential to competition, it is difficult to understand how any process that does not award the job to the highest ranked competitor can fulfill the constitutional mandate. The answer, I conclude, is that scoring and ranking are not absolute and invariable elements of a competitive selection process, but are among the tools that the Legislature and the Board can utilize, as they deem appropriate, in devising a competitive selection process.

In at least one aspect particularly significant here, the selection process for CEA positions differs from the process used with respect to most civil service positions. In general, civil service appointments are made from eligible lists. (Gov. Code, §§ 18900, 19050.) Eligible lists are established for classes of position, but are not position-specific. (Gov. Code, §§ 18532, 18532.2, 18900.) Once established, an eligible list may remain in effect for a considerable period, even years; and during that time, appointments made to positions within the class are made from the list. (Gov. Code, §§ 18901, 19050.) In contrast, CEA competitive examinations are position-specific. An appointing power conducts a competitive selection process for the particular CEA position to be filled. (Cal. Code Regs., tit. 2, § 548.30.)[2] In this light, the regulatory process requires only that the appointing power formally place competitors into one of two ranks: (1) the successful competitor who obtains the appointment, and (2) unsuccessful competitors.

As the majority concede, the nature of a CEA position requires that an appointing power be allowed to exercise considerable subjective judgment in evaluating qualifications. Because the person who obtains the appointment

[2]The results of the process may be used to make additional appointments to CEA positions that are substantially the same as the position for which the original examination was announced if: (1) the appointing power specifies in the announcement for the original examination the additional positions for which the competition shall be used, the methods and standards of evaluation to be used, and the time for which the results will be used; or (2) the appointing power later announces that applications will be accepted as a supplement to the original announcement and that all otherwise qualified persons who apply will be considered with those who applied under the original announcement. This is intended to facilitate future competition by reducing the need for repetitive evaluation but does not operate to confer eligibility for other positions in the CEA category. (Cal. Code Regs., tit. 2, § 548.30.)

must be well qualified and carefully selected, it is inconceivable that, if required to assign scores, an appointing power would *not* assign to the candidate it deems best qualified a score sufficient to place him or her in a reachable rank. Moreover, because the CEA selection process is position-specific rather directed to creating an eligible list for future appointments, it would appear that the imposition of a requirement that the appointing authority formally score and rank unsuccessful competitors would be a meaningless gesture that confers form but no substance to the competitive nature of the process.

What all of this boils down to can be summarized briefly. The Constitution requires that the appointment selection process be competitive, but otherwise leaves the Legislature and the Board with a free hand in devising a process best suited to the position to be filled. Whether a selection process is competitive must be determined from the totality of the process with reference to the particular position to be filled; and if, from the totality of the circumstances, it appears that a particular selection process is competitive, the courts must defer to the authority of the Legislature and the Board. In view of the unique nature of CEA positions, the position-specific nature of the selection process, and the totality of that process, I am satisfied that the process devised by the Legislature and the Board is competitive. Further, I do not believe that judicial imposition of a scoring and ranking requirement will add anything of substance to the competitive nature of the process. Accordingly, with appropriate deference to the wide discretion of the Legislature and the Board, I cannot say that the procedures are constitutionally inadequate for want of a requirement of specific ranking of candidates.

I must acknowledge that the discussion of this issue, in the majority opinion and in this dissent, may appear to be academic. The majority held this case pending a determination in *Alexander v. State Personnel Bd.* (2000) 80 Cal.App.4th 526 [95 Cal.Rptr.2d 324] (*Alexander*). In *Alexander*, a panel of this court, with the same lead author but with otherwise different panel members, considered challenges to a demonstration project devised by the Board pursuant to Government Code sections 19600 through 19607. The demonstration project incorporated selection procedures applicable to CEA's. (Cal. Code Regs., tit. 2, former § 549.6.) Concluding that scoring and ranking are essential to a competitive selection process, the *Alexander* opinion held that the CEA selection process was invalid and thus invalidated the demonstration project to the extent it incorporated the CEA process. (*Alexander, supra*, 80 Cal.App.4th at p. 543.)

Under the compulsion of *Alexander*, the Board amended its regulation governing the CEA selection process. (Cal. Code Regs., tit. 2, § 548.40.) The

regulation now requires an appointing power to assign a score to applicants and to place them within six broad ranks. The candidate selected for appointment must be in the top three ranks; if there are fewer than five candidates in those ranks, lower ranks may be added until there are at least five candidates available.

Although the Board's regulation now requires scoring and ranking in the CEA selection process, this was done under the compulsion of the decision in *Alexander*. That decision, and now this one, stand as the only decisional authority to hold that scoring and ranking are invariable, constitutionally mandated elements of a competitive selection process. That decision and this one effectively will tie the hands of the Legislature and the Board in devising competitive selection processes appropriate to various positions in the civil service.

Because the decision in *Alexander*, and now in this case, will operate prospectively to limit the discretion of the Legislature and the Board, the issue is not moot. (See *Save Stanislaus Area Farm Economy v. Board of Supervisors* (1993) 13 Cal.App.4th 141, 146-147 [16 Cal.Rptr.2d 408]; *Downtown Palo Alto Com. for Fair Assessment v. City Council* (1986) 180 Cal.App.3d 384, 391-392 [225 Cal.Rptr. 559].)

Having concluded that *Alexander* and the majority opinion in this case constitute unwarranted judicial intrusion upon the authority of the Legislature and the Board with respect to the CEA selection process, I register my dissent.

V

Plaintiffs' final contention is very brief. Board rules permit, in some circumstances, the transfer of an employee into a CEA position.[3] According to plaintiffs, appointment to a CEA position through transfer violates the constitutional and statutory requirement for competitive examination. Again, I disagree.

---

[3]California Code of Regulations, title 2, section 548.95 provides: "With the approval of the executive officer, an appointing power may transfer an employee from one career executive assignment position to another at substantially the same or lower level of salary. Such transfer or demotions may, with the written approval of all parties, be made between appointing powers. Transfers between positions in different Career Executive Assignment levels and assignments shall be governed by the standards contained in Sections 430, 431, 432, 433 and 435 for transfer between general civil service classifications."

California Code of Regulations, title 2, section 548.96 provides: "With the approval of the executive officer, and the concurrence of the affected employee, an appointing power may transfer an employee who has permanent status in a position in the general civil service in the class from which transfer will occur to a position in the career executive assignment category

The Constitution requires competitive examinations for appointment and promotion. (Cal. Const., art. VII, § 1, subd. (b).) It does not expressly preclude lateral transfer of employees without examination.

The propriety of lateral transfers of employees without competitive examination has long been recognized in our civil service system. (Gov. Code, §§ 18525.3, 19050.2-19050.7; Cal. Code Regs., tit. 2, §§ 425-435.) The Board rules permitting transfer of employees to CEA positions are consistent with the rules applicable to other civil service positions.

It is, of course, conceivable that an appointing power might attempt to effectuate what is in actuality a promotion in the guise of a transfer. Such an attempt would violate our constitutional and statutory civil service laws. (See *Pinion v. State Personnel Board* (1938) 29 Cal.App.2d 314, 319-320 [84 P.2d 185].) However, in the event an appointing power attempts such a subterfuge and the executive officer fails to curtail the effort by withholding approval, the remedy would be an action to establish that the transfer provision is unlawful *as applied.* The mere fact that an appointing power might attempt to abuse the power of transfer will not support a determination that the transfer rules are invalid on their face. (*Pacific Legal Foundation v. Brown, supra*, 29 Cal.3d at pp. 180-181.)

## VI

For the reasons stated above, I agree with the trial court that there is no merit in plaintiffs' constitutional attacks on the decisions of the legislative and executive branches of government concerning the creation and implementation of CEA's. Accordingly, I would affirm the trial court's judgment in its entirety.

On August 10, 2001, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied October 10, 2001.

---

which is at substantially the same level of salary as the general civil service class. Such transfer may, with the written approval of all parties, be made between appointing powers."