174 Cal.App.4th 424 (2009)
___ Cal.Rptr.3d ___
CALIFORNIA ATTORNEYS, ADMINISTRATIVE LAW JUDGES AND HEARING OFFICERS IN STATE EMPLOYMENT, Plaintiff and Appellant,
v.
ARNOLD SCHWARZENEGGER, as Governor, etc., et al., Defendants and Respondents.
No. C058415.
Court of Appeals of California, Third District.
May 28, 2009.
As modified June 2, 2009.
*426 Law Offices of Brooks Ellison and Patrick J. Whalen for Plaintiff and Appellant.
K. William Curtis, Warren C. Stracener, Kenneth R. Hulse, Todd M. Ratshin and Paul Starkey for Defendants and Respondents.

OPINION
RAYE, J. 
In these mandamus proceedings, the Attorney General and the union representing the lawyers in his office, among others, assert that the failure of the collective bargaining process under the State Employer-Employee Relations Act (SEERA; Gov. Code, § 3512 et seq.) has caused a *427 compensation crisis compromising public service and threatening the Attorney General's ability to uniformly and adequately enforce the law. Twenty-eight years ago the dissenters in Pacific Legal Foundation v. Brown (1981) 29 Cal.3d 168 [172 Cal.Rptr. 487, 624 P.2d 1215] (Pacific Legal Foundation) perceived a conflict between the mandate imposed upon the State Personnel Board (SPB) to enforce a civil service system "based on merit" and the collective bargaining process mandated by SEERA. (29 Cal.3d at pp. 203-209 (dis. opn. of Richardson, J.).)
Suggesting the dissenters were prescient, the union argues "[t]he end result of an unfettered application of the collective bargaining system is that the legal professionals in Bargaining Unit 2 are being grossly under-compensated compared to those in other civil service job classifications" to the detriment of merit principles. The union asks this court to remedy the alleged pay disparity with other public lawyers by ordering the Department of Personnel Administration (DPA) to adopt a parity formula or, alternatively, to base compensation on a "meaningful salary survey."
To justify the imposition of this radical remedy by a Court of Appeal rather than by the Legislature or by way of the collective bargaining process, the union urges us to employ an expansive definition of the merit principle and the concept of "like pay for like work" that is not found in the language of the Constitution, the statutes, or in Supreme Court precedent. We, however, must adhere to the plain meaning of those documents and will await a creative resolution of the wage crisis, if any, by the Legislature or by the people through the initiative process. The judgment denying the request for a peremptory writ of mandate is affirmed.

I

CONSTITUTIONAL CONTEXT
Article VII, like its predecessor, former article XXIV, of the California Constitution provides that "[i]n the civil service permanent appointment and promotion shall be made under a general system based on merit ascertained by competitive examination." (Cal. Const., art. VII, § 1, subd. (b); see Cal. Const., former art. XXIV, § 1.)[1] Article VII also establishes a nonpartisan five-member personnel board to "enforce the civil service statutes and, by majority vote of all its members, shall prescribe probationary periods and classifications, adopt other rules authorized by statute, and review disciplinary actions." (Art. VII, § 3, subd. (a).)
*428 In 1934 the people by initiative adopted article XXIV.[2] The ballot argument accompanying the initiative measure stated: "The purpose of this constitutional amendment is to promote efficiency and economy in State government. The sole aim of the act is to prohibit appointments and promotion in State service except on the basis of merit, efficiency and fitness ascertained by competitive examination. Appointments of inefficient employees for political reasons are thereby prohibited, thus eliminating the `spoils system' from State employment. [¶] . . . [¶] . . . [T]his constitutional amendment provides: (1) Employment in the classified service based solely on merit and efficiency; (2) a nonpartisan Personnel Board; (3) prohibition against exemptions from the merit system of employment; (4) correction of the temporary political appointment evil. [¶] Having by constitutional mandate prohibited employment on any basis except merit and efficiency, thereby eliminating as far as possible the `spoils system' of employment, the Legislature is given a free hand in setting up laws relating to personnel administration for the best interests of the State, including the setting up of causes for dismissal such as inefficiency, misconduct, or lack of funds." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 6, 1934), argument in favor of Prop. 7, p. 12.)
(1) "As this ballot argument demonstrates, the `sole aim' of the amendment was to establish, as a constitutional mandate, the principle that appointments and promotions in state service be made solely on the basis of merit. Having established this `merit principle' as a matter of constitutional law, and having established a nonpartisan Personnel Board to administer this merit principle, the constitutional provision left the Legislature with a `free hand' to fashion `laws relating to personnel administration for the best interests of the State.'" (Pacific Legal Foundation, supra, 29 Cal.3d at pp. 183-184, fn. omitted.)
Wielding that free hand, the Legislature in 1977 enacted SEERA (Stats. 1977, ch. 1159, § 4, p. 3751, codified in Gov. Code, § 3512 et seq.) to regulate the state's labor relations with state employees. The preamble explicitly reaffirmed the primacy of the merit principle as follows: "Nothing in this chapter shall be construed to contravene the spirit or intent of the merit principle in state employment, nor to limit the entitlements of state civil service employees . . . provided by Article VII of the California Constitution or by laws or rules enacted pursuant thereto." (Gov. Code, § 3512.)
*429 (2) Rejecting a constitutional challenge to SEERA, the majority of the Supreme Court concluded that "the collective bargaining process established by SEERA does not on its face conflict with the basic constitutional principles of article VII, section 1, subdivision (b). . . . [N]othing in the history of the amendment suggests that the establishment of a general system of appointment and promotion based on merit proposed to prohibit the Legislature from adopting a labor relations policy affording employees a meaningful voice in determining the terms and conditions of their employment; instead, the amendment simply sought to eliminate the `spoils system' of public employment." (Pacific Legal Foundation, supra, 29 Cal.3d at pp. 184-185, fn. omitted.)
The union contends, however, that the Supreme Court left open the possibility that SEERA could be unconstitutionally applied to a particular bargaining unit and the memorandum of understanding that results from the collective bargaining process. The majority wrote: "We recognize, of course, that theoretically the product of the collective bargaining process may possibly in specific instances conflict with the merit principle of employment embodied in article VII. Such a conflict would be most evident, for example, if the Governor and an exclusive bargaining representative agreed to a memorandum of understanding purporting to authorize hiring or promotion on a politically partisan basis." (Pacific Legal Foundation, supra, 29 Cal.3d at p. 185.) The union insists that the pay disparity between its members and other public employees who perform the same essential work violates the merit principle enshrined in article VII and thus presents the constitutional question left open in Pacific Legal Foundation.

II

FACTUAL AND PROCEDURAL CONTEXT
California Attorneys, Administrative Law Judges and Hearing Officers in State Employment (the union) is the exclusive representative for approximately 3,500 employees in "Bargaining Unit 2" for purposes of collective bargaining under SEERA. It is one of the smallest unions representing state employees and consists of attorneys, administrative law judges, deputy labor commissioners, and deputy parole hearing commissioners. For many years the union has been frustrated in its attempt to secure higher wages through collective bargaining and legislation.
*430 On June 29, 2007, the union filed a petition for alternative writ of mandate and/or declaratory relief. The following day, its memorandum of understanding with the State of California expired. In denying the petition, the trial court opined that the union was seeking "an unrealistic remedy from this Court" and that the essence of the petition was a complaint that DPA was not bargaining in good faith. Nevertheless, the court allowed the union leave to amend.
In August 2007 the union filed an amended petition in the superior court and an unfair practice charge with the Public Employment Relations Board (PERB) supported by many of the same declarations submitted in the mandamus proceedings. The following month PERB dismissed the unfair practice charge because it "did not state a prima facie case."
As alleged in the amended petition, Governor Arnold Schwarzenegger and the Director of DPA (defendants) are permitting salary measures for Bargaining Unit 2 that conflict with the merit principle SPB's constitutionally mandated classification system serves; violating the California Constitution by failing to adhere to the like-pay-for-like-work principle embodied in the merit system; violating their constitutional obligation to prevent the depletion of the quality of the public workforce in Bargaining Unit 2 and protect the civil service system from neglect, deterioration, diminution, dissolution, or destruction; and interfering with the Attorney General's ability to carry out his own constitutional mandate to ensure adequate and uniform enforcement of the laws.
Attached to the amended petition are voluminous documents to support the union's allegation that its members are vastly underpaid relative to other public attorneys throughout the state. An expert in human resource management and employment relations opined that undercompensation has rendered the state "the employer of last resort." He characterized DPA's attitude toward a high job vacancy rate as "both sanguine and cavalier." He provided an abundance of statistical evidence supporting the notion that Bargaining Unit 2 attorneys are significantly underpaid. For example, his declaration states that inexperienced lawyers who work for the cities and counties of Alameda, Los Angeles, Sacramento, San Diego, and San Francisco are paid 48 percent more on average than Bargaining Unit 2 attorneys with the same amount of experience, and inexperienced lawyers who work for the educational, governmental, and nonprofit sectors are paid 60 percent more on average than Bargaining Unit 2 attorneys with the same amount of experience. The expert found that the pay differential was even greater for the more experienced lawyers in the educational, governmental, and nonprofit sectors, *431 who make anywhere from 82 percent to 165 percent more than do Bargaining Unit 2 attorneys. For the more experienced lawyers working for the target cities and counties, the differential was about 28 percent.
The result of lagging wages over time has, according to the petition, made it difficult to attract, recruit, and retain Bargaining Unit 2 attorneys. In May 2007 Chief Deputy Attorney General James M. Humes wrote to the Governor's Cabinet Secretary and Deputy Chief of Staff Dan Dunmoyer that "it is irresponsible for the State to allow the quality of its attorneys to decline by offering salaries that are too low to attract and retain lawyers who are as qualified as those employed by other public entities." The directors of the Public Utilities Commission and the Office of Administrative Hearings recounted similar problems in filling vacancies and retaining competent administrative law judges.
Attorney General Edmund G. Brown, Jr., filed an amicus curiae brief in the trial court. He argued "[t]he substantial total compensation disparity between the Office of the Attorney General and other public sector employers now undermines the Attorney General's ability to abide by the merit principle." He maintained that the "competitive" component of the merit principle, "the cornerstone of the constitutional `system based on merit [ascertained] by competitive examination'" (quoting art. VII, § 1, subd. (b)), no longer exists in a meaningful form for three reasons: (1) to attract any candidates for open positions, the Attorney General must hire at the midlevel rather than at the entry-level salary range; (2) annual merit increases are dictated by the pressure to simply retain current employees and effectuate some pay relief rather than "`based [on] merit ascertained by competitive examination'" (ibid.); and (3) the compensation disparities have led to the de facto unraveling of the "most important `competitive examination' at the Attorney General's Officethe DAG IV examination."
Defendants object to the evidence as outdated, unsupported, and conclusory. In their demurrer to the amended petition, defendants asserted the union failed to exhaust its administrative remedies, PERB is the appropriate entity to determine whether defendants violated SEERA, and the amended petition was virtually identical to the petition previously denied by the court. The trial court overruled the demurrer and denied the amended petition.

III

THE MERIT PRINCIPLE
The union argues the Governor, through DPA, permits salaries for Bargaining Unit 2 employees that conflict with the merit principle served by SPB's *432 constitutionally mandated classification system. Underlying the argument is a very expansive interpretation of the constitutional mandate premised on the dissent in the seminal Pacific Legal Foundation case and a Little Hoover Commission report that concludes that compensation policies, formerly shaped by SPB, have devolved since the implementation of collective bargaining under SEERA.
The dissent in Pacific Legal Foundation expressed the view that the merit principle is intrinsically intertwined with a classification system constitutionally delegated to SPB and dependent on like pay for like work. (Pacific Legal Foundation, supra, 29 Cal.3d at p. 203 (dis. opn. of Richardson, J.).) According to the dissent, SEERA reduces SPB's constitutional classification authority to an "empty and anemic formalism" while the critical salary issues are negotiated and settled by the Governor and the Governor's bargaining representative. (29 Cal.3d at p. 204 (dis. opn. of Richardson, J.).) The union believes events have proved the dissent correct. The union, in its amended petition, states that SPB "is careful in maintaining a classification system" that ensures harmonious relationships between classes of employees, but the Governor and DPA have adopted a salary-setting approach that utterly ignores the classification system. The petition asserts: "While the Supreme Court believed the process could work at the time of its decision in Pacific Legal v. Brown, and it may well for some bargaining units, it has become apparent that [defendants'] application of [SEERA] has rendered the SPB classification process a nullity for . . . Bargaining Unit 2."
The union spotlights the compensation enjoyed by correctional officers as evidence that the classification system, as applied to Bargaining Unit 2 attorneys, is broken. The union is offended that correctional officers, who need only a high school diploma, often earn more than the lawyers who have successfully prosecuted the incarcerated inmates the correctional officers only supervise. According to the union, "[i]t is absurd to suggest that any real `merit' can be preserved in a civil service system that permits compensation to be determined by [defendants] without regard to all the criteria utilized by the SPB in exercising its constitutional classification powers to ensure that the civil service system is merit based." Even the Little Hoover Commission, the petition asserts, found as early as 1999 that collective bargaining has never been fully integrated with the merit system.
(3) The union's argument strays far from the narrow constitutional question before us and betrays a fundamental misunderstanding of the meaning of the merit principle. It is not our role to mediate salary disputes or to implement recommendations of the Little Hoover Commission, no matter how wise they may seem. Rather, the scope of our review is limited to a determination whether defendants' application of SEERA to Bargaining Unit 2 violates the constitutionally mandated merit principle.
*433 (4) Whatever the merits of the dissent in Pacific Legal Foundation, the majority opinion makes clear that the "sole aim" of article VII, section 1, subdivision (b) is to prohibit the "spoils system" of employment and promotion in state service and to thereby preserve a civil service system in this state free from decisionmaking on the basis of political patronage. (Pacific Legal Foundation, supra, 29 Cal.3d at pp. 181-185.) Defendants insist that none of the union's allegations suggest collective bargaining as applied to Bargaining Unit 2 has reintroduced spoils or invites the type of patronage article VII was designed to prevent. The union's theory, defendants argue, that the "merit principle" requires Bargaining Unit 2 employees to receive more meritorious pay because of the meritorious nature of their work misconstrues the real meaning of the constitutional mandate. We agree.
The history of the development of a nonpartisan civil service in this state supports the view that the constitutional provision was intended to eliminate patronage and a rancid "spoils system" corrupting state government. The Legislature created the first civil service system in 1913 to combat the political spoils system and to establish instead a nonpartisan system of state employment based upon merit. (Pacific Legal Foundation, supra, 29 Cal.3d at pp. 181-182.) The legislation failed to stem corruption, and by the early 1930's fully one-half of the permanent state employees were exempt from the law, temporary employees constituted more than a third of the entire system, and newspapers publicized the scandalous and politically motivated gubernatorial appointments. (Id. at p. 182.) The people interceded and adopted article XXIV, and a merit-based civil service system thereby gained constitutional stature. Article XXIV later became, without substantive change, article VII. (State Personnel Bd., supra, 37 Cal.4th at p. 521.)
(5) The ballot argument quoted herein (see, ante, at pp. 427-428) supports defendants' notion that the fundamental merit principle is the constitutional mandate that promotions and appointments in state civil service be made in a politically neutral setting. Thus, the "sole aim" of the merit principle is to eliminate, as best as possible, political favoritism in the state civil service.
The courts, too, have reinforced defendants' view that merit is the antithesis of patronage and favoritism. (State Personnel Bd. v. Fair Employment & Housing Com. (1985) 39 Cal.3d 422, 436-437 [217 Cal.Rptr. 16, 703 P.2d 354].) Appointments to the civil service, under article VII's umbrella, cannot be "made solely on the basis of political considerations or cronyism." (Professional Engineers v. Department of Transportation (1997) 15 Cal.4th 543, 564 [63 Cal.Rptr.2d 467, 936 P.2d 473] (Professional Engineers).) In Professional Engineers in Cal. Government v. State Personnel Bd. (2001) 90 Cal.App.4th 678 [109 Cal.Rptr.2d 375], this court adopted the argument *434 espoused by former Assistant Attorney General Willard Shank 35 years earlier, as follows: "`The "merit" principle was and still is dependent upon the preliminary determination that a prospective governmental employee should be qualified through a combination of education, training and experience for employment. The essence of the "spoils system" on the other hand turned upon how active a prospective appointee had been in his support of a winning political party or candidate. [¶] The civil service reformers found in the "competitive examination" the device through which qualifications could be ascertained.'" (Id. at p. 690, quoting Mr. Shank's opposition to the complaint in earlier litigation discussed therein.)
(6) The union does not disagree that the merit principle was meant to eliminate patronage and cronyism, but it insists the principle encompasses much more. The union contends the merit principle is "multi-faceted," including an "inherent link between salaries and merit." We find no support for such an expansive interpretation of the constitutional provision, either in the text, the ballot argument, the historical context, or the cases the union cites. Nor does the union define what the parameters of such a fluid merit principle would be or how, as a practical matter, such a slippery definition would not subvert the separation of powers and would not lurch us into the role of labor arbitrator. Constrained as we are by both precedent and the separation of powers, we subscribe to the Supreme Court's admonition that the sole aim of the merit principle was to dismantle the spoils system in this state. It was not, as the union implies, to equate merit with meritorious.

IV

LIKE WORK FOR LIKE PAY
The court in Pacific Legal Foundation left open the question of whether the "like-pay-for-like-work" principle is constitutionally based.[3] The union would answer in the affirmative and argues defendants are violating the Constitution. Defendants, on the other hand, insist the principle is derived from statute (Gov. Code, § 19826, subd. (a)), does not implicate the "merit" aspects of the personnel system, and requires only "horizontal parity" so that all attorneys throughout state civil service are compensated at comparable rates. In any event, according to defendants, the provisions of the statute may be superseded by contrary collective bargaining provisions.
*435 As it did in explaining the merit principle, the union turns to the language of the dissent in Pacific Legal Foundation for its understanding of the like-pay principle. "Properly understood," according to the union, "`like-pay-for-like-work'. . . necessarily includes the notion that the constitutionally mandated merit-based civil service system cannot properly function if salaries for civil servants are so far below those of other `comparable classes of public employees' . . . that the state becomes unable to recruit and retain competent employees." (Quoting Pacific Legal Foundation, supra, 29 Cal.3d at p. 203 (dis. opn. of Richardson, J.).)
Quoting verbatim from Justice Puglia's Court of Appeal opinion, the dissent explained: "`Our review of the evolution and history of the relevant constitutional and statutory provisions satisfies us that the responsibility to classify civil service positions conferred by the Constitution upon the SPB is inseparable from the responsibility to insure like pay for like work. The latter is thus as much a constitutional command upon the SPB as the former. The uniform application of equal compensation for commensurate duties and responsibilities is essential to an employment system based on classification according to merit. Indeed, as we have demonstrated, the principle of like pay for like work permeates the entire civil service statutes, the enforcement of which the Constitution delegates exclusively to the SPB (Cal. Const., art. VII, § 3, subd. (a)). Therefore we conclude that the authority to fix salaries of civil service employees necessarily reposes in the SPB alone as an integral part of its constitutional power to classify positions. We further conclude that the exclusive exercise of these functions by the politically insulated SPB is essential to the maintenance of "a general system based on merit" as contemplated by article VII, section 1 of the Constitution. [Citation.] It is in the assignment of the salary-setting function to the bargaining process between the Governor and employee representatives that SEERA comes into fatal conflict with the Constitution.'" (Pacific Legal Foundation, supra, 29 Cal.3d at p. 207 (dis. opn. of Richardson, J.).)
The union slices and dices the Pacific Legal Foundation dissent, extracting only a sliver of the dissent's rationale and thereby subverting its meaning. The union ignores the pivotal fact that, in the dissent's view, collective bargaining itself was unconstitutional because SPB alone was charged with classification and enforcement of the civil service statutes. Thus, the dissent saw a fully integrated mechanism for eliminating spoils and patronageSPB, independent and politically insulatedto enforce a merit principle, not only through a competitive examination but by setting wages, and those wages would ensure that like pay was received for like work. It did not, as the union's revisionist account suggests, proclaim that the merit principle, divorced from SPB's classification system, encompasses the like-pay-for-like-work mantra.
*436 The Pacific Legal Foundation majority, of course, rejected the dissent's integrated view of SPB's autonomous role and upheld the constitutionality of collective bargaining on behalf of state employees. Yet the union now urges us to adopt the principle that its members are entitled to like pay for like work in order to preserve the SPB classification system and the merit principle. Without authority, other than portions of the dissenting opinion in Pacific Legal Foundation, it posits that the "logical implication[]" of article VII is that the "organic" civil service system must include like pay for like work. This is quite a slender reed upon which to base a constitutional challenge.
(7) The like-pay-for-like-work principle is of statutory, not constitutional, origin. One of the broad objectives of the civil service statutes is to "provide a comprehensive personnel system for the state civil service, in which . . . [¶] . . . [p]ositions involving comparable duties and responsibilities are similarly classified and compensated." (Gov. Code, § 18500, subd. (c)(1).) More specifically, Government Code section 19826, subdivision (a) provides, in pertinent part: "[DPA] shall establish and adjust salary ranges for each class of position in the state civil service subject to any merit limits contained in Article VII of the California Constitution. The salary range shall be based on the principle that like salaries shall be paid for comparable duties and responsibilities. In establishing or changing these ranges, consideration shall be given to the prevailing rates for comparable service in other public employment and in private business."
(8) Yet the union would have us expand the meaning of the constitutionally mandated merit principle to incorporate the statutory principle of like pay for like work. The statutory principle is indeed laudable as a matter of public policy. But our role is not to distort the plain meaning of the Constitution to advance public policy. Nor in these circumstances do we have the evidence or the expertise to evaluate whether the union's allegations are borne out in the marketplace. In today's marketplace the competitiveness of salary packages shifts rapidly. Our task as an intermediate court of review is to construe the meaning of the Constitution by subscribing to well-worn rules of interpretation. There is nothing in the plain language, history, or broader context of article VII to suggest that the merit principle encompasses the notion of like pay for like work. For the reasons discussed above, extracting but a part of an old dissent does not provide the authority we need to decide otherwise.

*437 V

THE NEGLECT, DETERIORATION, DIMINUTION, DISSOLUTION, OR DESTRUCTION OF THE CIVIL SERVICE SYSTEM
As the union's opening brief gains steam, each argument poses a more dire assessment of the gravity of the pay disparity and the consequences for the entire civil service system. Not only does the pay disparity violate the constitutional merit principle, the union contends, it also threatens the deterioration and destruction of the civil service itself and thereby violates defendants' constitutional duty to protect an "organic" civil service. The union offers but one distinguishable case in support of such an expansive constitutional duty and little, if any, evidence to support a looming Armageddon for civil service.
In Professional Engineers, supra, 15 Cal.4th 543, the Supreme Court addressed the very different question of whether legislative approval of private contracting by Caltrans (California's Department of Transportation) provided a sufficient basis to modify an earlier injunction prohibiting Caltrans from privately contracting for engineering and inspection services that state civil service employees had traditionally performed on state highway projects. State Compensation Ins. Fund v. Riley (1937) 9 Cal.2d 126, 134-136 [69 P.2d 985] (Riley) and its progeny held "the state is prohibited from using `independent contractors' except in narrow, exceptional situations." (Professional Engineers, supra, 15 Cal.4th at p. 563.) In rejecting Caltrans's invitation to disapprove and overrule Riley, the Supreme Court explained: "As an analytical matter, Riley's rule seems appropriate to assure that the state civil service is not neglected, diminished, or destroyed through routine appointments to `independent contractors' made solely on the basis of political considerations or cronyism." (Professional Engineers, at pp. 563-564.)
It is true, as the union suggests, the Supreme Court inferred a ban on private contracting, except in circumscribed circumstances, from former article XXIV. The union leapfrogs from Professional Engineers's inference that the state civil service could easily be neglected, diminished, or destroyed by private contracting made solely on the basis of politics or favoritism to the far more expansive inference that article VII charges defendants with a broad duty to protect and preserve the civil service and to assure that noncompetitive wages do not diminish the quality of the civil service. That is a gargantuan jump we are unable to make for several reasons.
*438 First the Supreme Court faced a very different dilemma in Professional Engineers. Cases since the 1930's had interpreted article XXIV, and later article VII, as an implicit limitation on private contracting. (Professional Engineers, supra, 15 Cal.4th at pp. 563-565.) Then, in 1990 Caltrans was enjoined from contracting out services public employees had traditionally performed. (Id. at p. 547.) Although Caltrans did not appeal the judgment enjoining private contracting, the Legislature passed a bill allowing the very acts the injunction prohibited. (Id. at pp. 552-553.) In that context, the Supreme Court found the legislation violated article VII in that private contracting based on political favoritism and cronyism could diminish or destroy the civil service. (Professional Engineers, at p. 547.)
Second, because wholesale private contracting is an obvious threat to civil service, it is a small leap to infer that the Constitution bars legislation that undermines the civil service system and violates a specific judgment entered earlier in the same case. Such a narrow and justified inference does not, however, impose a nebulous duty on defendants, not otherwise defined or circumscribed, to structure the pay scale in any particular way. We reject the union's attempt to equate private contracting with wage negotiations and to expand a principle derived in a narrow and discrete context to a broad-based wage formula. It is one thing to recognize that private contractors can elude the merit principle and quite another to micromanage the collective bargaining process and for a court to dictate how wages are to be calculated. Certainly, Professional Engineers does not support judicial intervention of this novel magnitude.[4]
Finally, the union hints that low wages necessitate the hiring of outside counsel to provide expertise the service lacks. But as Professional Engineers itself points out, the state retains the ability to hire private contractors if it can provide sufficient evidence to support a factual finding that civil service staff would be unable to adequately and competently perform the work at issue. (Professional Engineers, supra, 15 Cal.4th at p. 570.) Here, the union contends the Attorney General has difficulty attracting and retaining experienced and competent lawyers, and yet the Attorney General at the same time commends his lawyers for the quality of service they provide. In short, there simply is insufficient evidence in this record to support the somewhat *439 amorphous claim that the state is subverting the merit principle by hiring outside counsel. Moreover, there is no evidence that any contracting has been politically motivated or based on favoritism or cronyism.

VI

THE ATTORNEY GENERAL'S CONSTITUTIONAL DUTY
As suggested above, the union asserts the Attorney General is unable to meet his constitutional duty to adequately and uniformly enforce the law because of defendants' noncompetitive pay package. The union insists it has presented compelling evidence that the Attorney General has become "the employer of last resort," forced to hire those who cannot find other employment. In essence, the union turns to us to staff the Attorney General's office with higher paid, more experienced, and more talented lawyers.
We will assume the truth of the statistics and expert opinions offered by the union in support of its petition. We have no reason to doubt that public servants throughout the state are vastly underpaid. But the difficult budget choices facing defendants present thorny questions of policy priorities far removed from the constitutional questions before us. The question we must address is not whether Bargaining Unit 2 employees deserve higher pay or whether the pay disparity compromises quality. Rather, we must decide whether the union has demonstrated that the pay scale constitutes an unconstitutional application of SEERA by making it impossible for the Attorney General to perform his constitutional mandate. The union has failed to provide authority to support this claim.
The union points us to the Attorney General's duty to adequately and uniformly enforce the law without providing any authority as to the meaning or scope of this duty. And while we have abundant evidence of the pay disparity between Bargaining Unit 2 employees and their counterparts in other public agencies and private firms, we can find no evidence the Attorney General has been unable to adequately enforce the law. We acknowledge the Attorney General himself testified to the staffing challenges that confront him and his legitimate concern for sustaining a top-notch legal team. But those fiscal challenges do not necessarily mean the lawyers in his office are incompetent or that he has been unable to adequately enforce the law. With *440 this dearth of authority, not to mention lack of current and compelling evidence of a catastrophic brain drain, we simply cannot say the negotiations constitute an unconstitutional application of SEERA.

DISPOSITION
The judgment is affirmed.
Scotland, P. J., and Butz, J., concurred.
SCOTLAND, P. J., Concurring. 
This litigation falls under the category of "be careful what you ask for."
Edmund G. Brown, Jr., as a candidate for Governor in the general election of 1974, "said repeatedly" that he favored the passage of a bill to authorize collective bargaining for state employees, a goal that "[s]weeping victories for labor-endorsed candidates" was "expected to ensure" (Bernstein, Labor Bills' Chances Improve, L.A. Times (Nov. 8, 1974) p. C1). Victorious on election day, Governor Brown used his influence the following year to conduct "marathon talks to get a consensus behind a collective bargaining bill" for state employees (Bernstein, Brown Pursues Public Employee Bargaining Bill, L.A. Times (June 13, 1975) p. C1). The effort succeeded when in 1977, Governor Brown "signed SB 839 (Dills, D-Gardena) enacting the State Employer-Employee Relations Act providing most state employees with meet and confer rights similar to those given employees of local agencies under the Meyers-Milias-Brown Act" (Press Release, Off. of the Governor, Sept. 30, 1977). The legislation was supported by then Attorney General Evelle J. Younger, who opined "collective bargaining will assure [state] employees, governmental leaders and the citizenry that legitimate concerns [of state workers regarding salary and working conditions] will be heard and dealt with fairly" (Younger, letter to Governor Edmund G. Brown, Jr., re Sen. Bill No. 839 (1976-1977 Reg. Sess.) Sept. 20, 1977).
Now, Edmund G. Brown, Jr., as Attorney General of California, asserts "the failure of the collective bargaining process under the State Employer-Employee Relations Act" has resulted in his office "facing a compensation crisis which undermines public service and threatens the ability of the Attorney General to uniformly and adequately enforce the law." This is so, he explains, because in "contrast to other bargaining units who have the raw power to successfully engage in collective bargaining dynamics," the labor unit representing lawyers employed by the state (Unit 2) "lacks the membership *441 numbers as well as the professional flexibility to effectively engage in job actions." Thus, the "product of years of collective bargaining for Unit 2 is a staggering total compensation gap between its members and those employed in comparable public sector law offices," which has caused applicants for deputy attorneys general positions to "routinely decline offers of employment once they learn of the low salary being offered." Simply stated, according to the Attorney General, SEERA (State Employer-Employee Relations Act; Gov. Code, § 3512 et seq.) as applied to Unit 2 "now sabotages the ability of the Attorney General to hire and promote `based upon merit ascertained by competitive examination'. . . ."
Saying SEERA "has resulted in a de facto destruction of the merit principle" with respect to Unit 2 attorneys, the labor union representing lawyers employed by the Attorney General's office and other state agencies even suggests the state is becoming the "employer of last resort" for attorneys, risking "poor performance or even no performance" by lawyers who are less "competent" and "lack[] the motivation to perform well in meeting the objectives of the employer."[1]
It cannot be disputed that the political clout of certain labor unions, achieved through massive monetary contributions to campaigns of some seeking election to state office, has given the appearance of favored treatment to the membership of those unions. (Lucas, Davis' plan gives prison guards big pay boostCritics see a trade-off for election support, S.F. Chronicle (Jan. 13, 2002) p. A21); Morain, Wealth Buys Access to State Politics, L.A. Times (Apr. 18, 1999) p. A1).)
Nevertheless, I agree with my colleagues on this case that, for the reasons articulated in our decision, the Attorney General and the labor union representing lawyers employed by the state have failed to establish that, as applied to Unit 2, SEERA conflicts with the merit principle of employment embodied in California's Constitution. Thus, as a court, we have no basis upon which to intervene.
To the extent that SEERA has proved to be unwise or flawed, it is up to the Legislature or the people through the initiative process, not the courts, to *442 correct it. (In re Brent F. (2005) 130 Cal.App.4th 1124, 1130 [30 Cal.Rptr.3d 833]; see also Knight v. Superior Court (2005) 128 Cal.App.4th 14, 19 [26 Cal.Rptr.3d 687]; People v. Hunt (1999) 74 Cal.App.4th 939, 948 [88 Cal.Rptr.2d 524]; Souza v. Lauppe (1997) 59 Cal.App.4th 865, 874 [69 Cal.Rptr.2d 494]; In re Marriage of Fisk (1992) 2 Cal.App.4th 1698, 1702 [4 Cal.Rptr.2d 95]; Squaw Valley Ski Corp. v. Superior Court (1992) 2 Cal.App.4th 1499, 1515 [3 Cal.Rptr.2d 897]; City of Victorville v. County of San Bernardino (1991) 233 Cal.App.3d 1312, 1322 [233 Cal.Rptr. 1312, 285 Cal.Rptr. 206]; Williams v. County of San Joaquin (1990) 225 Cal.App.3d 1326, 1334 [275 Cal.Rptr. 302]; Neighbours v. Buzz Oates Enterprises (1990) 217 Cal.App.3d 325, 334 [265 Cal.Rptr. 788].)
NOTES
[1] All further references to "article" are to articles of the California Constitution.
[2] Article XXIV later became, without substantive change, article VII. (State Personnel Bd. v. Department of Personnel Admin. (2005) 37 Cal.4th 512, 521 [36 Cal.Rptr.3d 142, 123 P.3d 169] (State Personnel Bd.).)
[3] "[W]e have no occasion in this case to determine whether the `like-pay-for-like-work' concept is a constitutionally based doctrine embedded in either the merit principle of article VII, section 1, subdivision (b) or the State Personnel Board's classification power under section 3, subdivision (a), or alternatively is solely of statutory origin. (See, e.g., [Gov. Code,] §§ 18500, subd. (c)(1); 18850.)" (Pacific Legal Foundation, supra, 29 Cal.3d at p. 193, fn. 16.)
[4] Private contracting was the subject of an amendment to the California Constitution in 2000. (Art. XXII, § 1, added by initiative, Gen. Elec. (Nov. 7, 2000), commonly known as Prop. 35; see Consulting Engineers & Land Surveyors of California v. Department of Transportation (2008) 167 Cal.App.4th 1457 [84 Cal.Rptr.3d 900].)
[1] Generally speaking, the written work and the oral advocacy done in this court by lawyers in the Attorney General's office does not reflect a lack of competence or lack of motivation to perform well, as suggested by their labor union.